Paul KURTZ, Dr., Appellant

v.

James A. BAKER, Secretary of the
Treasury, et al.

No. 86–5660.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 12, 1987.

Decided Sept. 18, 1987.

Ruth Bader Ginsburg, J., filed dissent-
ing opinion.

Ronald A. Lindsay, Washington, D.C., for appellant.

Steven R. Ross, Washington, D.C., for appellee House Chaplain Ford.

Michael Davidson, Washington, D.C., for appellee Senate Chaplain Halverson. Ken U. Benjamin, Jr. and Morgan J. Frankel, Washington, D.C., also entered appearances for appellee Halverson.

Richard K. Willard, Asst. Atty. Gen., Joseph E. diGenova, U.S. Atty., Michael Jay Singer, and Jay S. Bybee, Attys., U.S. Dept. of Justice, Washington, D.C., were on the brief for appellees Secretary of the Treasury, et al.

Before RUTH BADER GINSBURG, BUCKLEY and D.H. GINSBURG, Circuit Judges.

BUCKLEY, Circuit Judge:

Dr. Paul Kurtz is a professor of philosophy and an advocate of "secular humanism." He challenges the refusal of chaplains of the United States Senate and House of Representatives to invite non-believers to deliver secular remarks in both houses of Congress during the period each house reserves for morning prayer. He advances claims under the establishment and free speech clauses of the First Amendment, and under the equal protection principles of the due process clause of the Fifth Amendment. Because appellant lacks standing under Article III of the Constitution, the judgment of the district court is vacated and the case is remanded with directions to dismiss the complaint for lack of subject matter jurisdiction.

## I. BACKGROUND

The United States Senate and the United States House of Representatives have each appointed an official chaplain whose duties include the opening of daily sessions with prayer. The official chaplains of the Senate and the House occasionally invite guest chaplains of various denominations, some not ordained, to deliver the opening prayer. Dr. Kurtz asserts that these guest chaplains must be considered "guest speakers" because restricting their function to prayer would violate the Constitution. He would like to be invited as a "guest speaker" to deliver a moral but "non-theistic" invocation in the Senate and the House during what he styles their "opening ceremonies." Because denial of standing should rest on a careful assessment of all relevant circumstances, it is necessary to set out the facts in some detail.

## A. *Appellant's Request to the Chaplains*

Appellant wrote to the Reverend Richard C. Halverson, Chaplain of the Senate, and the Reverend James D. Ford, Chaplain of the House, requesting permission to address their respective houses "[o]n behalf of the Council for Democratic and Secular Humanism." Letter from Dr. Kurtz to Rev. Halverson (Feb. 13, 1984), Joint Appendix ("J.A.") at 29–30; Letter from Dr. Kurtz to Rev. Ford (Feb. 13, 1984), J.A. at 71–72. In each letter Kurtz "request[ed] the opportunity to appear as a guest speaker and to open a daily session ... with a short statement in which [he] would remind the [members of the Senate and the House] of their moral responsibilities." Letter to Rev. Halverson, J.A. at 29; Letter to Rev. Ford, J.A. at 71. He advised both chaplains that he would not utter a prayer if invited:

> As a secular humanist, I would not, of course, invoke any deity during my remarks. However, my remarks would otherwise fall within the traditional format. If for some reason you believe it is necessary to open the session with the invocation of a deity, I would have no objection to sharing the podium with you. I do believe that it is important, however, for the [members of the Senate and the House] occasionally to have the opportunity to hear non-theists speak of moral responsibilities since one of the common prejudices in our country is that non-theists do not recognize any moral responsibilities.

Letter to Rev. Halverson, J.A. at 29; Letter to Rev. Ford, J.A. at 71.

## B. *The Chaplains' Responses*

On February 27, 1984, Halverson responded with thanks and the following statement: "In the three years I have been the Chaplain my policy has been to invite those who are sponsored by a Senator." Letter from Rev. Halverson to Dr. Kurtz (Feb. 27, 1984), J.A. at 31. Kurtz, a citizen of the State of New York, then wrote to Senators Moynihan, D'Amato, Goldwater, Hatfield, and Weicker requesting sponsorship, but none agreed. J.A. at 32–33 (first letter to Sen. Moynihan), 35–36 (to Sen. Weicker), 37–38 (second letter to Sen. Moynihan), 39 (to Sen. D'Amato), 40 (to Sen. Goldwater), 41 (to Sen. Hatfield). Only the chief legislative assistant to Senator Hatfield responded in writing, essentially as follows:

> There is no provision or desire for lectures from whatever source. I can appreciate the convictions which you expressed in your "proposed opening." However, the intent of the time of prayer is to acknowledge our dependence upon the transcendent Creator.
>
> ... [Moreover Senator Hatfield would not] use one of his rare opportunities to present a guest pastor for someone who [sic] he does not know and who cannot out of conviction abide by the spirit of the rules of the Senate.

Letter from Thomas R. Getman, Chief Legislative Assistant to Sen. Mark O. Hatfield, to Dr. Kurtz (June 5, 1984), J.A. at 42.

After failing to attract a sponsor, Kurtz again wrote to Halverson, renewing his earlier request and stating he was not aware of the existence of a Senate rule supporting Halverson's sponsorship requirement. Letter from Dr. Kurtz to Rev. Halverson (Aug. 30, 1984), J.A. at 43. Halverson responded on September 7 by restating his earlier position, explaining that only the Senate can make an exception to the rule that only Senators may address the Senate, and that the Senate Chaplain was allowed "to invite two guests per month to open the Senate with prayer. Obviously this does not include inviting someone to speak, however briefly." Letter from Rev. Halverson to Dr. Kurtz (Sept. 7, 1984), J.A. at 44.

Ford responded to appellant's first letter by stating that "[t]he rules of the United States House of Representatives provide that each session will open with a prayer by the Chaplain. It is therefore impossible, pursuant to the rules of the House, for me to invite you be [sic] a guest speaker." Letter from Rev. Ford to Dr. Kurtz (Mar. 26, 1984), J.A. at 73. Kurtz then sent Ford a second letter suggesting he would speak after Ford said a prayer. Letter from Dr. Kurtz to Rev. Ford (Apr. 6, 1984), J.A. at

74–75. Ford replied that "[t]he chaplain cannot yield to another person for a statement." Letter from Rev. Ford to Dr. Kurtz (Apr. 25, 1984), J.A. at 76. Kurtz then predictably suggested that he speak before Ford or, perhaps less predictably, that they "deliver a truly joint opening by alternating the lines of our texts." Letter from Dr. Kurtz to Rev. Ford (May 23, 1984), J.A. at 77.

## C. *The Complaint*

On September 19, 1984, appellant Kurtz filed a complaint styled an "action challenging the constitutionality of certain practices of the Chaplain of the U.S. House of Representatives ... and the Chaplain of the U.S. Senate." Complaint at 1, J.A. at 8. Kurtz names as defendants the Secretary of the Treasury and the Treasurer of the United States ("Treasury appellees"), and the Reverends Ford and Halverson. The complaint alleges two counts. Count one in part makes the following allegations concerning the chaplains:

38. The exclusion of non-theists, such as Plaintiff, from the guest speakers program on the basis of the content of their remarks violates the Free Speech, Free Exercise and Establishment Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment to the Constitution.

39. To the extent that Senate and House rules require guest speakers to utter a prayer, those rules violate the Free Speech, Free Exercise and Establishment Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment to the Constitution.

40. To the extent that any policy of the Senate or the Senate Chaplain to invite only those speakers sponsored by a Senator results in discrimination against speakers from unpopular minority groups, such as Plaintiff, that policy violates the Free Speech, Free Exercise and Establishment Clauses of the First Amendment and the Due Process Clause of the Fifth Amendment to the Constitution.

Complaint at 10, J.A. at 17.

In regard to the Treasury appellees, count one makes only one specific asser-

tion, namely that they "are responsible for disbursing federal funds that support the chaplaincies." Complaint at 8, J.A. at 15. Count two of the complaint alleges that Halverson routinely uses opening prayers in the Senate to disparage "the beliefs of non-theists." Complaint at 11, J.A. at 18. Count two, however, is not before us.

Kurtz requests declaratory and injunctive relief with respect to count one. He seeks declarations that (1) the exclusion of "non-theists" from the "guest speaker program" in the Senate and the House, (2) any Senate or House rule requiring "guest speakers to utter a prayer," and (3) any policy to invite only sponsored speakers to the Senate which results in discrimination against "non-theists," violate the free speech and religion clauses of the First Amendment and the due process clause of the Fifth Amendment. *Id.* at 19. He also requests permanent injunctions barring the exclusion of "non-theists" from the "guest speaker program[s]" of the House and the Senate, or alternatively barring the disbursement of funds from the United States Treasury for the House and Senate chaplaincies.

## D. *Disposition in the District Court*

The defendants moved for summary judgment on all counts. The district court granted that motion as to count one, reserving its disposition of count two for a later date. *Kurtz v. Baker*, 630 F.Supp. 850, 859, 861 (D.D.C.1986). The court first considered defendants' three-pronged challenge to its jurisdiction over the subject of the complaint; namely, that (1) Kurtz lacked standing, (2) his challenge presented nonjusticiable political questions, and (3) his action was barred by defendants' immunity derived from the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1. It rejected all three arguments, affirmed Kurtz' standing, and proceeded to decide the merits. *Id.* at 854–55.

The court determined that Kurtz' injury was sufficiently concrete, directly traceable to the challenged conduct, and redressable.

It also interpreted Kurtz' challenge as one to the chaplains' interpretation of Senate and House rules, but not to the rules themselves, thus distinguishing cases that applied the increasingly weak political question doctrine. Finally, it found that opening prayers did not so intimately partake of the legislative process as to fall within the protection of the Speech or Debate Clause. *Id.* The court concluded that the free speech and equal protection claims in count one lacked merit, relying primarily on *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (Nebraska legislature's chaplaincy practice does not violate the establishment clause). *Kurtz,* 630 F.Supp. at 855–58.

### E. *Arguments on Appeal*

Kurtz calls this case a "textbook illustration" of proper standing. Brief for Appellant at 34. Appellees disagree. House counsel contend that Kurtz lacks standing in part because his request was not personal, but rather a request on behalf of the Council for Democratic and Secular Humanism. Brief for Appellee Ford at 22–23 (quoting Letter from Dr. Kurtz to Rev. Ford, J.A. at 71). Senate counsel asserts that there is no "guest speaker program" in the Senate except one very closely controlled by the Senate leadership. *See* Brief for Appellee Halverson at 8. Senate counsel further contends that "[t]he lack of judicial power to compel either House of the coordinate legislative branch to alter its constitutionally valid rules requires affirmance of the grant of summary judgment." *Id.* at 16–17.

The Treasury appellees invoke Article III against appellant by relying on the requirement that the injury alleged be legally cognizable. They then invoke the political question doctrine to define Kurtz' alleged injury as non-cognizable for purposes of Article III. Brief for Appellees Baker and Ortega at 16–19. In their political question discussion, counsel for the Treasury appellees argue that Kurtz' complaint is a challenge to House and Senate rules, notwithstanding the district court's contrary conclusion, and that the Constitution textually commits to each house the exclusive power

to adopt the challenged rules. Although they concede that in *United States v. Ballin,* 144 U.S. 1, 12 S.Ct. 507, 36 L.Ed. 321 (1892), the Supreme Court reviewed the constitutionality of a House Rule, they assert that the Court did so only to the extent necessary to establish whether the Rule "ignore[d] constitutional restraints or violate[d] fundamental rights." Brief for Appellees Baker and Ortega at 20–21 (quoting *Ballin,* 144 U.S. at 5, 12 S.Ct. at 509). They then rely on *Marsh v. Chambers* to show that the rules meet the constitutional tests. As we conclude appellant is without Article III standing for the reasons set forth below, we do not reach the political question issue.

### II. DISCUSSION

In Anglo-American law the traditional case has pitted a personally aggrieved plaintiff against a defendant who has wronged him. The judicial task has been to determine whether the defendant caused the plaintiff a readily identifiable injury, and if so, whether to order the defendant to stop or make whole the wrong. Like so many others the Supreme Court has recently examined for standing, this litigation presents a claim that is non-traditional. *See Diamond v. Charles,* 476 U.S. 54, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986) (physician lacks standing to defend State abortion law); *Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (parents of black children representing nationwide class lack standing to challenge IRS policies for awarding tax-exempt charitable status to racially discriminatory private academies); *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (individuals and organization desiring strict separation between Church and State lack standing to challenge conveyance of federal property to sectarian school); *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (individuals and organization lack standing to challenge relaxation in indigent-care requirements applicable to hospitals desiring tax-exempt

charitable status); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (organizations and individuals representing a class lack standing to challenge racially discriminatory housing ordinance); *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974) (organization and individuals lack standing to challenge membership of members of Congress in armed forces Reserves).

Deciding whether an action lies within the judicial power of the United States requires the careful application of precedents construing Article III's case-or-controversy requirement. Such investigation can become a barren and abstract exercise unless the basic thrust of the Supreme Court's decisions is kept in mind. That underlying pattern has been summarized as follows:

> There is no case or controversy, the reasoning has gone, when there are no adverse parties with personal interest in the matter. Surely not a linguistically inevitable conclusion, but nonetheless an accurate description of the sort of business courts had traditionally entertained, and hence of the distinctive business to which they were presumably to be limited under the Constitution.

A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers,* 17 Suffolk U.L.Rev. 881, 882 (1983) (footnote omitted).

As explained below, appellant alleges injury to various social but only one cognizable, personal interest. Injury to his social interest in having the views of secular humanists sympathetically presented in Congress cannot satisfy Article III. Injury to the one personal interest he does assert could not have been caused by appellees because, first, he has not alleged that they had the power to inflict it and, second, an allegation that they had such power would not have been tenable if made. To believe that the two chaplains could have authorized appellant to address a non-religious statement to the United States Senate and House of Representatives during periods explicitly reserved for prayer requires a suspension of ordinary common sense that this court need not indulge.

■ Thus the complaint barely survives scrutiny under the first part, and thoroughly fails under the second part, of the test the Supreme Court has developed for determining Article III standing: (1) there must be concrete personal injury to the plaintiff, (2) such injury must be fairly traceable to the challenged conduct, and (3) the injury must be "likely" to be redressed if the relief sought is granted. *See Diamond,* 106 S.Ct. at 1707–08; *Allen,* 468 U.S. at 751–52, 104 S.Ct. at 3324–25; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758; *see also Eastern Ky. Welfare Rights Org.,* 426 U.S. at 41–42, 96 S.Ct. at 1925–26; *Warth,* 422 U.S. at 498–99, 95 S.Ct. at 2205. Because the second part of the test is not satisfied, it is unnecessary to estimate whether an order from this court compelling the chaplains to invite appellant to address Congress or to broaden the category of "guest speakers" to include non-believers would be "likely" to result in Kurtz being heard.

### A. Article III Injury

The court must police its jurisdiction by applying its own careful analysis of the complaint, guided by precedent. *See Bender v. Williamsport Area School Dist.,* 475 U.S. 534, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986). In this regard, Justice Powell reminds us that where a party's standing is challenged in a motion to dismiss, a reviewing court "must construe the complaint in favor of the complaining party." *Warth,* 422 U.S. at 501, 95 S.Ct. at 2206.

The first requirement for standing is that the plaintiff "allege a distinct and palpable injury to himself." Reasonably construed in favor of appellant, the complaint alleges three types of injury. First, the complaint alleges that "Dr. Kurtz is also a federal taxpayer." Complaint at 3, ¶ 5, J.A. at 10. This suggests a claim of injury in the misuse of his taxes to support unconstitutional chaplaincy practices. Second, by alleging that "the exclusion of nontheists is divisive and confers an important symbolic benefit upon religion," the com-

plaint could be said to allege stigmatic injury to atheistic beliefs in violation of the Constitution. Complaint at 10, ¶ 37, J.A. at 17. Third, the complaint presents two versions of an "exclusion injury": the first is based on the claim he was "denied the opportunity to appear as a guest speaker [because] he is a non-theist and would not invoke a deity in his remarks," Complaint at 9, ¶ 35, J.A. at 16, and the other, "[t]he exclusion of non-theists, such as Plaintiff, from the guest speaker program...." Complaint at 10, ¶ 38, J.A. at 17.

These allegations of injury cannot be accepted on their face without examination. The petitioners in *Allen v. Wright*, for example, alleged that Internal Revenue Service regulations and practices encouraged white students to attend racially segregated private academies receiving IRS tax-deductible charity status, thus resulting in a more racially segregated public education for petitioners' black children. The Court first examined petitioners' various allegations of injury, and determined that only one, the black "children's diminished ability to receive an education in a racially integrated school," *Allen*, 468 U.S. at 756, 104 S.Ct. at 3327, was judicially cognizable. Similarly, here it is necessary to examine each of appellant's alleged injuries for compliance with the requirement that they be personal and concrete. *Cf. Von Aulock v. Smith*, 720 F.2d 176, 185 (D.C.Cir.1983) (court denied standing on the basis of a "reasonably extensive inquiry into the underlying merits of the lawsuit").

We conclude that the first claim of injury does not satisfy Article III's injury requirement. The second allegation, interpreted as an assertion of stigmatic injury to secular humanists, also falls short of what Article III requires. In the third category, only one of the two claims of "exclusion injury" satisfies the Article III requirement.

Each of these conclusions deserves careful explanation, especially in view of appellant's assertion that this lawsuit is a "textbook illustration" of proper standing.

#### 1. Taxpayer Standing

■ The complaint may fairly be construed to allege "taxpayer standing," but such an allegation cannot satisfy Article III in this case. In *Valley Forge* the Court denied standing to an association dedicated to the separation of Church and State and four of its employees who brought an action against the United States Department of Health, Education and Welfare, and a seminary of the Assemblies of God. They challenged the department's approval of the conveyance of United States property to the seminary, and premised their standing on the " 'depriv[ation] of the fair and constitutional use of [their] tax dollar.' " 454 U.S. at 476, 102 S.Ct. at 761 (brackets original) (quoting complaint).

The Court rejected this taxpayer standing theory by distinguishing the case from *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). *Flast* is the only Supreme Court decision holding that a taxpayer has standing to complain about alleged government misuse of tax revenues in violation of the establishment and free exercise clauses of the First Amendment. The Court interpreted *Flast* to apply narrowly "to challenges directed 'only [at] exercises of congressional power,' " *Valley Forge*, 454 U.S. at 479, 102 S.Ct. at 762 (brackets original) (quoting *Flast*, 392 U.S. at 102, 88 S.Ct. at 1954), and still more narrowly to "an exercise of authority conferred by the Taxing and Spending Clause of Art. I, § 8." 454 U.S. at 480, 102 S.Ct. at 762.

The *Valley Forge* Court relied on *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), to buttress a narrow reading of *Flast*. *Valley Forge*, 464 U.S. at 481, 102 S.Ct. at 763. In *Schlesinger* plaintiffs brought an action challenging the military reserve commissions of several members of Congress as contrary to the incompatibility clause of Article I. *See* U.S. Const. art. I, § 6, cl. 2 ("no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office"). The Court rejected the plaintiff's "taxpayer standing"

theory because they "did not challenge an enactment under Art. I, § 8, but rather the action of the Executive Branch in permitting Members of Congress to maintain their Reserve status." *Schlesinger*, 418 U.S. at 228, 94 S.Ct. at 2935; *see also United States v. Richardson*, 418 U.S. 166, 175, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974) (taxpayer standing denied because challenge was "not addressed to taxing and spending power, but to the statutes regulating the CIA").

In this case Kurtz challenges no "exercise of congressional power" or "congressional enactment," but internal practices of *each* house of Congress. *See* U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings...."). Because the power rests only with each house, there exists no enactment by Congress, which would require *inter alia* passage in both houses and presentment to the President. *See* U.S. Const. art. I, § 7, cl. 2. Therefore appellant cannot satisfy *Flast*'s first requirement for taxpayer standing, namely that the challenge be directed "at exercises of *congressional* power." Furthermore, as there is no allegation that guest chaplains receive a stipend from the federal government, we cannot see how the practice of inviting guest chaplains to offer the opening prayer is an exercise of Congress' taxing and spending power. Thus the suit also fails *Flast*'s second requirement for taxpayer standing.

Even if appellant were able to meet both requirements, he would still fail to establish justiciability. The Supreme Court has recently explained that a taxpayer's ability to meet the *Flast* test does not bestow automatic standing. More is required.

> Although not necessary to our decision, we note that any connection between the challenged property transfer and respondents' tax burden is at best speculative and at worst nonexistent.... Even if respondents had brought their claim within the outer limits of *Flast*, therefore, they still would have encountered serious difficulty in establishing that they "personally would benefit in a tangible way from the court's interven-

tion." *Warth v. Seldin*, 422 U.S., at 508 [95 S.Ct., at 2210].

*Valley Forge*, 454 U.S. at 480–81 n. 17, 102 S.Ct. at 763 n. 17. The Supreme Court thus confirms that *Flast* did not address the causation and redressability questions decided in *Warth, Eastern Kentucky Welfare Rights Org.*, and *Allen*. In sum, *Flast* does not apply here because: (1) this lawsuit is not a challenge to congressional action taken pursuant to the taxing and spending power; and (2) as shown below, appellant lacks standing under Article III causation principles.

As *Flast* does not apply, the court must follow the general rule against taxpayer standing in *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (decided with *Massachusetts v. Mellon*). *Valley Forge*, 454 U.S. at 476–77, 102 S.Ct. at 761 (a discussion of taxpayer standing "must begin with *Frothingham v. Mellon* ..."). In *Frothingham* a federal taxpayer challenged the constitutionality of a federal statutory scheme granting federal funds to the Commonwealth of Massachusetts for the purpose of improving maternal and infant health. The Court held that any effect on the plaintiff's tax burden was "remote, fluctuating and uncertain," *Frothingham*, 262 U.S. at 487, 43 S.Ct. at 601, so that her alleged injury could have been nothing more than her disagreement with allegedly unconstitutional official conduct. *Id.* at 488, 43 S.Ct. at 601. The same conclusion obtains here with respect to appellant Kurtz' tax burden. He cannot plausibly contend that anything appellees have done has had an impact on his contributions to the United States Treasury, so that in asserting taxpayer standing he is alleging nothing more than disagreement with the actions he challenges.

As the complaint refers to the Treasury appellees only to establish a link, for purposes of alleging taxpayer standing, between federal expenditures and the House and Senate chaplaincies, the absence of taxpayer standing means that only appellant's standing to challenge the chaplains' conduct needs further examination.

## 2. Stigmatic Injury to Atheism

■ The second possible basis for appellant's claim of injury is that the exclusion of non-believers like Kurtz stigmatizes secular humanists in violation of the Constitution. The Supreme Court rejected such allegations of injury in *Allen v. Wright*, and we must do the same here. In *Allen* this court had upheld the black parents' standing on the theory that "[t]he sole injury [respondents] claim is the denigration they suffer as black parents and schoolchildren when their government graces with tax-exempt status educational institutions in their communities that treat members of their race as persons of lesser worth." 468 U.S. at 749, 104 S.Ct. at 3323 (brackets original) (quoting *Wright v. Regan*, 656 F.2d 820, 827 (D.C.Cir.1981)). The Supreme Court reversed, stating as follows:

> There can be no doubt that this sort of noneconomic injury is one of the most serious consequences of discriminatory government action and is sufficient in some circumstances to support standing. See *Heckler v. Mathews*, 465 U.S. 728, 739–740, [104 S.Ct. 1387, 1395, 79 L.Ed.2d 646] (1984). Our cases make clear, however, that such injury accords a basis for standing only to "those persons who are personally denied equal treatment" by the challenged discriminatory conduct, *ibid.*

*Allen*, 468 U.S. at 755, 104 S.Ct. at 3326. Appellant's allegation of stigmatic injury is that "the exclusion of non-theists is divisive and confers an important symbolic benefit upon religion." Complaint at 10, ¶ 37, J.A. at 17. As *Allen* makes clear, allegations of stigmatic injury will not suffice to link a plaintiff personally to the conduct he challenges unless, as in *Heckler*, the plaintiff personally has been denied a benefit. *See Heckler*, 465 U.S. at 741 n. 9, 104 S.Ct. at 1396 n. 9 (appellee's claim is not a generalized claim of the right to constitutional government of the type Article III rejects "because appellee personally has been denied benefits that similarly situated women receive"). It is thus the denial of a benefit, whether economic or not, that is a basis for standing. We therefore turn to plaintiff's allegation of exclusion injury, his third allegation, as the dispositive allegation of injury in this case. We later return to *Heckler* only to consider whether it helps appellant overcome the causation problems on which our analysis ultimately rests.

## 3. Exclusion from the House and Senate Chambers

The third claim of injury is that appellant has been deprived, and secular humanists as a class are deprived, of the opportunity to address either house of Congress as participants in the chaplains' "guest speakers" programs. Paragraphs 38 and 35 of the complaint, fairly read, allege two distinct variations on the exclusion theme. Complaint at 9–10, J.A. at 16–17. The first, reasonably implied in paragraph 38, is that the chaplains' refusal to permit "nontheists" to participate in the guest chaplain programs deprives atheists (and therefore Kurtz) of the opportunity to address the Senate and the House. The second, in paragraph 35, is that Kurtz has been denied the benefit of addressing either house because he does not believe in a deity. The difference between the two injuries, like much in standing law, is both subtle and important. Although the first identifies an injury to Kurtz as a member of a class which is denied any chance to address each house, the second imagines appellant standing at the podium in the Senate and the House chambers but for the chaplains' rejections.

■ The first allegation, stated another way, is that the chaplains' assent would have given a class of individuals, of which Kurtz is a member, the opportunity to *qualify* to address the House or the Senate, and the opportunity is itself an honor illegally withheld. Such a claim is simply too tenuous. The complaint makes no attempt to allege that the mere fact of receiving a favorable response from Ford or Halverson would have been of any value to Kurtz, aside from its furtherance of his ultimate goal of actually addressing each house. His reply brief makes clear, moreover, that Kurtz' real interest is in "partici-

pating in the opening ceremonies." Reply Brief for Appellant at 11.

■ The second allegation of "exclusion injury" alleges that Kurtz has been prevented from addressing each house of Congress. This allegation satisfies Article III's injury requirement because it is sufficiently personal and concrete. It is the sole allegation of injury reasonably implied in the complaint that is judicially cognizable. It is the sole allegation of injury the court can carry on to the second and third steps in the Article III standing inquiry: causation and redressability.

The allegation is not attack-proof, however, and it is appropriate to explain why one particularly strong challenge to it cannot prevail. As Kurtz will not pray and yet asks to participate in each house's moment of prayer, it could be argued he has excluded himself. An analogy may be drawn to a pacifist Quaker who seeks to be commanding officer of a nuclear ballistic missile submarine, and sues when he is denied the position. In such an instance it could be said that the applicant clings to beliefs that are incompatible with what he desires. The whole theory of appellant's case, however, is that government must be blind to classifications based on theistic belief. If the "guest speaker programs" were in fact only "guest chaplain programs" then, appellant's argument goes, the programs would be unconstitutional. Because the court cannot adjudicate the merits of appellant's constitutional claim at the jurisdictional threshold, these considerations cannot defeat Kurtz' standing.

We must therefore conclude that appellant's complaint of exclusion from the floor of the Senate and the House satisfies Article III's injury requirement.

**B.** *Causation*

■ The conduct challenged is the decision of Halverson and Ford to deny Kurtz' requests. Having identified the only allegation in the complaint capable of satisfying Article III's requirement of concrete and personal injury, the question for the court is the following: Is Kurtz' inability to address the Senate or the House fairly

traceable to the chaplains' rejection of Kurtz' requests? We conclude that it is not because (1) there is no allegation that the chaplains had discretion to grant appellant's requests, and (2) such an allegation would in any event be untenable.

The complaint does not allege that Kurtz was standing at the door of the Senate or the House, figuratively speaking, ready to enter and walk to the floor when the chaplains barred his way. Indeed, Kurtz does not even allege that each house has granted its chaplain discretionary authority such that, with the chaplain's assent, there would have been a "substantial probability" of Kurtz addressing either house of Congress. *See Warth,* 422 U.S. at 504, 95 S.Ct. at 2208. In the absence of an allegation that the chaplains had the power to permit him to address the House and Senate in the manner he sought, the court could not conclude that the chaplains "caused" appellant's exclusion.

■ Even if appellant had alleged that the chaplains had the authority to grant him floor privileges, such an allegation could not be seriously entertained. The court may take judicial notice of the fact that the opportunity to address either house is a privilege rarely extended to outsiders, and then only with the approval of the members of the respective houses. The President of the United States and foreign heads of state and government are permitted, on special occasions, to address the Senate and the House; but again, only with the approval of members. Even if the chaplains had agreed to invite Kurtz, it would be unreasonable to imagine that they could have provided him with the actual opportunity to deliver non-religious remarks to either house of Congress during the time expressly set aside for prayer.

In addition, members of both houses have expressed strong endorsement of congressional prayer. That fact would further undermine any contention that the leadership of either house has authorized the chaplains to transform the period reserved for prayer into what appellant has styled an "opening ceremony" in which "non-

theistic" remarks could be delivered, however uplifting. House Rule VII states that "[t]he Chaplain shall attend at the commencement of each day's sitting of the House and open the same with prayer." W. Brown, *Constitution—Jefferson's Manual and Rules of the House of Representatives*, H.R.Doc. No. 277, 98th Cong., 2d Sess. § 655 at 330 (1985). Rule XXIV provides that "[t]he daily order of business shall be as follows: First. Prayer by the Chaplain." *Id.* § 878 at 614.

It is clear that members of the House take these rules very seriously. On March 30, 1982, in response to this court's decision in *Murray v. Buchanan*, 674 F.2d 14 (D.C. Cir.1982) (constitutional challenge to congressional chaplaincy is justiciable), *withdrawn, vacated, and appeal dismissed*, 720 F.2d 689 (D.C.Cir.1983) (*en banc*), the House unanimously adopted H.R.Res. 413, 97th Cong., 2d Sess., 128 Cong.Rec. 5890–96 (Mar. 30, 1982) reaffirming that its daily sessions shall commence with a prayer by the chaplain. Counsel for Ford asserts with complete persuasiveness that "[t]he House has never intended to initiate a free-for-all in which any interested person could appear for the purpose of self-expression on moral and philosophical issues." Brief for Appellee Ford at 29.

As for the Senate, it has long provided by resolution that "the Chaplain shall open each calendar day's session of the Senate with prayer." S.Res. 8, 76th Cong., 1st Sess., 84 Cong.Rec. 1150 (1939). Senate Rule IV(1)(a) regulates commencement of daily sessions, and provides for "prayer by the Chaplain." *Standing Rules of the Senate*, S.Doc. No. 22, 99th Cong., 2d Sess. 3 (1986). Senate Rule IV(2) refers to the "customary daily prayer by the Chaplain." *Id.* at 4. Given these explicit references to *prayer* in both houses of Congress, it defies belief that Rev. Halverson or Rev. Ford could have provided appellant the privilege of either floor for any purpose other than prayer.

Senate Majority Leader Robert C. Byrd, in an address on the history of the Senate chaplaincy, noted that "the number of guest chaplains is limited to two per month." 126 Cong.Rec. 16,765 (1980). When appellant tried to obtain such a rare invitation, not one senator he contacted agreed to invite him. Were that not impediment enough, Senate and House rules place strict limitations on access to their respective chambers. Senate Rule XXIII states: "Other than the Vice President and Senators, no person shall be admitted to the floor of the Senate while in session, except as follows: [list of specific government officials and Senate functionaries]." *Standing Rules of the Senate* at 17–18. Furthermore, any senator may require that an unauthorized person be removed from the chamber upon a point of order made and sustained. *See* F. Riddick, *Senate Procedure* 675–79 (1981). Thus, even if appellant were to find a senator to sponsor him, and even if Rev. Halverson were to agree to invite him to deliver a non-prayer, it would require action by only one senator to force his expulsion from the chamber. For a comparable rule in the House of Representatives, see L. Deschler and W. Brown, *Procedure in the U.S. House of Representatives* ch. 4 § 3.1 at 26 (1982).

It is true that *if* a chaplain decided to ignore the limits to his authority, and *if* he decided to smuggle Kurtz into his house's chamber, appellant *might* have a chance to attain his goal of addressing the Senate or the House before his purpose was discovered. But Article III requires a chain of causation less ephemeral than a coin tossed into a wishing well. In *Warth*, for example, members of social minorities who challenged restrictive zoning laws were found to be without standing to claim that the laws denied them the opportunity to purchase affordable housing in the area of their choice. Plaintiffs alleged, and the Supreme Court was willing to assume, that the challenged housing ordinance prevented the construction of inexpensive homes, and was designed to deny minorities housing in the town of Penfield, New York. 422 U.S. at 502, 95 S.Ct. at 2207. The Court acknowledged, moreover, that individual petitioners desired housing in the town and had tried unsuccessfully to find it. *Id.* at 503, 95 S.Ct. at 2207. It nevertheless denied petitioners standing:

We may assume, as petitioners allege, that respondents' actions have contributed, perhaps substantially, to the cost of housing in Penfield. But there remains the question whether petitioners' inability to locate suitable housing in Penfield reasonably can be said to have resulted, in any concretely demonstrable way, from respondents' alleged constitutional and statutory infractions. Petitioners must allege facts from which it reasonably could be inferred that, absent the respondents' restrictive zoning practices, there is a *substantial probability* that they would have been able to purchase or lease in Penfield and that, if the court affords the relief requested, the asserted inability of petitioners will be removed.

*Id.* at 504, 95 S.Ct. at 2208 (emphasis added) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973)). In the case before us, as in *Warth*, appellant has failed to show in any "concretely demonstrable way" that but for his exclusion from the chaplains' "guest speaker" programs, there is a "substantial probability" he would have been able to address a *non*-prayer to one or both houses of Congress.

Thus we are left with little more than appellant's discontent with what he views as a practice that discriminates against secular humanists in violation of the First Amendment. As the Supreme Court pointed out in *Valley Forge*, however, absent a case or controversy a federal court is without authority to address an establishment clause claim, however sincerely advanced: "[T]he philosophy that the business of the federal courts is correcting constitutional errors ... has no place in our constitutional scheme." 454 U.S. at 489, 102 S.Ct. at 767.

C. *The Dissent's Alternative Theories*

The dissent suggests that as "Kurtz did plead, in the alternative, for a funding cutoff, so long as Congress categorically excludes non-theists from opening the legislators' day," he could have amended his pleadings to "assert this 'equal, nonprotection' prayer (for relief): if non-theistic guests are excluded, ... then theistic guests must be excluded too." Dissent at 1151. Invoking *Heckler v. Mathews* and the policies of Fed.R.Civ.P. 15(a) and 54(c), the dissent suggests that the court could order the chaplains to end the guest chaplain programs of the Senate and the House, and thus afford Kurtz a remedy if his complaint had merit. Dissent at 1151–1152.

This argument is unavailing because it avoids, rather than resolves, the causation analysis essential to any determination of standing whether it be applied to the prayer for relief Kurtz has in fact made or the prayer that the dissent finds in the complaint. Unlike the defendants here, the defendant in *Heckler* had sufficient discretion, but for the challenged statute, to grant the plaintiff the benefits he sought. Here appellant does not challenge a directive from the House or the Senate that their chaplains not admit Kurtz to benefits otherwise available to him. Rather, Kurtz challenges the chaplains' failure to arrogate authority which the complaint does not convincingly allege they had. An order of this court directing the chaplains to discontinue the guest chaplain programs of their respective houses would necessarily assume that the chaplains had authority to do so.

As we noted earlier, *supra* pp. 1142–1144, the chaplains have no authority to compel either house to accede to appearances of a guest chaplain. Nor may the chaplains themselves terminate the guest chaplain program. *See* Sen. Robert C. Byrd's statement on the History of the Senate Chaplaincy, 126 Cong.Rec. 16,765 (1980) (pointing out that the guest chaplain program originally allowed more than two guests per month, and that when the then-Senate Chaplain wished to establish the two-per-month limit, he first obtained the permission of then-Senate Majority Leader Lyndon Johnson). Furthermore, if the court were to order the chaplains to discontinue the program, both houses would still have the power to invite guest chaplains to lead them in prayer without the intervention of their official chaplains. While such an order might provoke a conflict on a matter of constitutional principle between

the houses of Congress and this court, it would involve a test of political will rather than of law because this court is without authority to act outside the boundaries of Article III.

For the same reasons, we cannot rely on the "substitute parties" doctrine the dissent reads in *Powell v. McCormack*, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). In *Powell* the Court considered an action brought by a duly elected congressman and others complaining of his exclusion from the House of Representatives. During the previous Congress, the House had voted to exclude Congressman Powell from the chamber and to deny him a salary, and directed the appropriate House employees to comply. Congressman Powell named, among others, the Speaker of the House, the Doorkeeper, and the Sergeant-at-Arms. After finding that the congressional defendants were immune from suit under the Speech or Debate Clause, U.S. Const. art. I, § 6, cl. 1, the *Powell* Court held that plaintiffs could challenge the resolution excluding Congressman Powell by proceeding against the employee defendants responsible for implementing it. *Powell*, 395 U.S. at 504, 89 S.Ct. at 1955.

The *Powell* Court did not cure a problem of Article III standing by substituting parties, but only a problem of immunity under the Speech or Debate Clause. More fundamentally, in this case there is no basis for concluding that the chaplains were implementing an unconstitutional directive from their superiors when they rejected Kurtz' requests for invitations to address each house. In *Powell* the Sergeant-at-Arms and Doorkeeper of the House, pursuant to the challenged resolution, respectively refused to disburse a salary to a duly elected congressman and denied him access to the House floor. The Court stressed that the congressional "employees are acting pursuant to express orders of the House...." *Id.* By contrast, it is not within the chaplains' responsibilities to pass upon unorthodox requests to address either house of Congress, and there is no allegation that the Senate or the House directed its respective chaplain to exclude Kurtz, as the House excluded Congressman Powell.

■ Far from barring judicial review of "most actions of Congress," Dissent at 1150, today we hold only that a plaintiff challenging a government official's refusal to grant him a benefit must credibly allege that the defendant could have granted the benefit but for unlawful conduct. While appellant in this case strives to show the chaplains acted unlawfully, he can make no showing that their actions mattered.

## III. CONCLUSION

This suit concerns appellant's attempt to compel the chaplains of the Senate and the House to allow him to address secular remarks in their respective chambers during the periods explicitly reserved for prayer. As appellant has not alleged, and cannot plausibly allege, that the chaplains have the authority to satisfy his requests, the cognizable injury he alleges is not fairly traceable to them. Therefore this dispute is not one "traditionally thought to be capable of resolution through the judicial process," *Allen*, 468 U.S. at 752, 104 S.Ct. at 3325 (quoting *Flast*, 392 U.S. at 97, 88 S.Ct. at 1951). The district court's judgment on count one is vacated, and the case is remanded with instructions to dismiss the complaint for lack of subject matter jurisdiction under Article III of the Constitution.

*So ordered.*

RUTH BADER GINSBURG, Circuit Judge, dissenting from the court's standing disposition:

In *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), the Supreme Court decided on the merits a challenge to the prayer practice of the Nebraska legislature. Relying upon a tradition "unbroken ... for two centuries in the National Congress," *id.* at 795, 103 S.Ct. at 3338, the Court held that no establishment clause violation occurs when a state legislature engages a chaplain and uses public funds to pay for the chaplain's services. Controlled by *Marsh*, and following this court's lead in *Murray v. Buchanan*, 720

F.2d 689 (D.C.Cir.1983) (*en banc*),[1] the district court rejected as insubstantial Kurtz's claim of a constitutional right to bid for a "guest speaker" invitation to the opening of a House or Senate day. *Kurtz v. Baker*, 630 F.Supp. 850 (D.D.C.1986). Accordingly, the district court granted the defendants' motions for summary judgment. I would affirm that disposition.

The majority rests its decision on "standing." In a complicated opinion, my colleagues blend several concepts one might group under the general heading "justiciability." I cannot join in their amalgamation of the questions: *who* may complain of allegedly unlawful government action; *against whom* may such actions be brought; *what kinds of issues* may courts legitimately adjudicate; when does a complaint fail to state a tenable claim for relief. I therefore set out the less complex resolution I would provide for this case. I then comment on infirmities in the majority's standing solution.

### I.

To recapitulate what the court spreads out elaborately, plaintiff-appellant Paul Kurtz is a professor of philosophy and a leader of the humanist movement. He wishes to deliver what he terms "opening remarks" at a daily session of the House or Senate. The official Senate and House chaplains occasionally invite guest chaplains to deliver the opening prayer required by the rules of each chamber. Calling these invitations "guest speaker programs," Kurtz complains that the chaplains of both chambers have refused to consider him as a "guest speaker" because his remarks would not invoke any deity.

Kurtz maintains that the freedom of speech and establishment clauses of the first amendment, and the due process clause of the fifth amendment, secure his right to receive consideration as a guest speaker at "opening ceremonies" of our national legislature, although those ceremonies have until now consisted exclusively of prayer. The district court, instructed by the Supreme Court's 1983 exposition in *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019, reached and definitively rejected Kurtz's claim of a constitutional right not to be excluded, because he is a non-theist, from the opportunity to speak in place of, or share the podium with, a congressional chaplain. *Kurtz v. Baker*, 630 F.Supp. 850 (D.D.C.1986). I would affirm for the reasons well-stated in the district court's cogent opinion.

Kurtz, it bears emphasis, has misdescribed what the rules of Congress authorize. Neither the House nor the Senate authorizes its chaplain to conduct "opening ceremonies" or "speaker programs." The relevant rules provide simply and specifically for the chaplains' delivery of "prayer." U.S. Senate Rule IV, § 1(a) (Presiding Officer takes the chair "following the prayer by the Chaplain"); U.S. House of Representatives Rule VII (Chaplain shall open each day's sitting "with prayer"); U.S. House of Representatives Rule XXIV, § 1 ("The daily order of business shall be as follows: First. Prayer by the Chaplain."). The congressional chaplains have no warrant themselves to utter words that do not compose a prayer, and they have no commission from the House or Senate to engage others to extend remarks of a secular character.[2]

---

**1.** In *Murray*, federal taxpayers sought to challenge payment of salaries and certain expenses for chaplains of the Senate and House of Representatives. We reviewed the parties' presentations in light of *Marsh* and concluded that the Supreme Court had answered the question *Marsh* presented with "unmistakable clarity": opening each legislative day with prayer by a chaplain paid out of public funds does not violate the establishment clause of the first amendment. We then (1) dismissed the appeal; (2) vacated the judgment of the district court, which had dismissed the complaint, without considering the merits, on "standing" and "polit-

ical question" grounds; and (3) remanded the case with instructions to dismiss the complaint "for want of a substantial constitutional question." *Murray*, 720 F.2d at 690; *see Kurtz v. Baker*, 630 F.Supp. 850, 855 (D.D.C.1986) (observing that this court dismissed the claim in *Murray* "not for lack of standing, but for failure to state a viable constitutional claim," and that "the *Marsh* Court recognized plaintiff's standing to raise a similar claim").

**2.** In accord with the district court, *see* 630 F.Supp. at 856–57, I find no threshold blockage to Kurtz's claim against the chaplains and Trea-

The *Marsh* approach and analysis, assiduously followed by the district court, also provided the basis for this court's *en banc* disposition in *Murray v. Buchanan,* 720 F.2d 689 (D.C.Cir.1983). *See supra* note 1. *Marsh* rejected on the merits a first amendment-establishment clause challenge to the Nebraska legislature's practice of beginning each session with a prayer by a chaplain paid by the state. The Supreme Court traced "[t]he unbroken practice for two centuries in the National Congress," *Marsh,* 463 U.S. at 795, 103 S.Ct. at 3338, and noted the variety of systems in the states: "several ... choose a chaplain who serves for the entire legislative session"; "[i]n other states, the prayer is offered by a different clergyman each day"; some states pay their chaplains and others do not." *Id.* at 794 n. 18, 103 S.Ct. at 3337 n. 18. The common feature, however, as the Court observed, is the invocation of "Divine guidance." *Id.* at 792, 103 S.Ct. at 3336. Prayer to open each legislative day, the Court stated, was a religious observance acceptable to the drafters of the first amendment, *id.* at 790–91, 103 S.Ct. at 3335–36, and is today "part of the fabric of our society." *Id.* at 792, 103 S.Ct. at 3336.

In light of *Marsh,* we held in *Murray* that a federal taxpayer's establishment clause challenge to the payment of salaries to congressional chaplains "fail[ed] to raise a substantial constitutional question." *Murray,* 720 F.2d at 690. Kurtz's challenges are no less vulnerable.

The House and Senate rules Kurtz imaginatively reads to allow for "ceremonies" and "guest speakers" in fact authorize opening legislative sessions *with prayer,* nothing more and nothing else. Kurtz recognizes that *Marsh* accepted legislative prayer against an establishment clause objection; he points out, however, that *Marsh*

did not involve free speech and due process contentions by one who seeks an opportunity to participate personally as a speaker. But the existing legislative prayer practice, *Marsh* plainly indicates, fits into a special nook—a narrow space tightly sealed off from otherwise applicable first amendment doctrine. As to the establishment clause, Justice Brennan described *Marsh* as "carving out an exception ... rather than reshaping ... doctrine to accommodate legislative prayer." *Marsh,* 463 U.S. at 795, 796, 103 S.Ct. at 3338 (Brennan, J., dissenting). I think it fair to infer that the Supreme Court would appraise the free speech claim proffered by Kurtz in the same manner it appraised the establishment clause claim proffered by *Marsh,* and with the same result. Kurtz's argument to the contrary exhibits little realism and large indulgence in wishful thinking.

Kurtz, I stress, does not want to take part in the session opening traditionally maintained by Congress, for that opening does not include secular remarks. Kurtz's claim, therefore, is inevitably an attack on Congress' customary, opening-with-prayer observance. The prayer practice that has existed in legislative assemblies in the United States for "more than 200 years," *Marsh,* 463 U.S. at 792, 103 S.Ct. at 3336, I conclude, is not subject to constitutional assault given the High Court's recent and resounding declaration. Because of the "unique" historical roots of prayer to open the legislature's day, *see id.* at 791, 103 S.Ct. at 3335, and the status of prayer in that context, unadorned by surrounding ceremony, as "part of the fabric of our society," *id.* at 792, 103 S.Ct. at 3336, Kurtz has, under current jurisprudence, no tenable free speech, establishment clause, or due process claim to advance.[3] I would so hold directly and would not avoid the

sury officers by reason of the Speech or Debate Clause. While inspirational, prayer in Congress does not appear to be "integral to lawmaking." *See Walker v. Jones,* 733 F.2d 923 (D.C.Cir.), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984).

**3.** *Marsh* essentially affirmed that the historic practice of an opening prayer burdens no "fundamental right" of non-theists. Thus Kurtz can-

not salvage his failed first amendment claim by cloaking it in a fifth amendment due process (equal protection component) mantle. *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 54–55, 103 S.Ct. 948, 959–60, 74 L.Ed.2d 794 (1983) (entitlement-to-access argument that Court rejected under first amendment, freedom-of-speech rubric "fares no better in equal protection garb").

question by a circuitous determination that Kurtz lacks standing to seek its settlement.

## II.

The majority ultimately recognizes that Kurtz's complaint satisfies Article III's injury-in-fact requirement.[4] "The whole theory of [Kurtz's] case," as Judge Buckley accurately captures it, "is that government must be blind to classifications based on theistic belief." Court's Opinion at 1142. Because the House and Senate do classify based on theistic belief, i.e., their Rules afford room for a "guest chaplain program," but not for a "guest speaker program," Kurtz is denied *the opportunity* to have his request considered. Denial of that opportunity, Kurtz contends, is unconstitutional.

Although they acknowledge that Kurtz meets the core, injury-in-fact requirement, my colleagues nonetheless conclude that Kurtz lacks standing because he cannot show causation, i.e., that his injury is "traceable to the chaplains' rejection of Kurtz' requests" for a guest speaker bid. *Id.* at 1142. The majority emphasizes that the chaplains lacked authority to grant Kurtz's requests in face of the firm will of Congress, expressed in its internal Rules, to open sessions with prayer; they then maintain, essentially, that Congress made and *only Congress* can unmake the Rules determining that prayer will be the exclu-

sive benediction upon the opening of legislative sessions. *See id.* at 1142–1143. If this is indeed the pivotal point, then the majority—notwithstanding its use of a "standing" label—is deciding not *who* may sue, but an anterior question, viz., *what issues* are legitimately open to third branch resolution.

Under my colleagues' analysis, as I understand it, the court would find Kurtz's claim beyond judicial competence no matter who challenged Congress' Rules. A member of Congress, unless I miss the majority's meaning, would fare no better. *But cf. Marsh,* 463 U.S. at 786 n. 4, 103 S.Ct. at 3333 n. 4 (upholding complainant's standing both as a Nebraska legislator and as a taxpayer). If the perceived infirmity is the invulnerability of Congress' Rules to judicial review rather than the identity of the challenger, however, then is not the majority's position one most appropriately placed under the headline "political question"?[5]

Perhaps the majority resists such placement because it recognizes that "political question" is a "weak" doctrine, *see* Court's Opinion at 1137,[6] while standing decisions are today more prominent and, in general, more restrictive than once was the case.[7] But the Supreme Court has not yet abandoned the position that

> [t]he fundamental aspect of standing is that it focuses on the party [and] not on

---

4. On the way, the majority indicates that the Supreme Court takes a restrictive view of standing in "litigation present[ing] a claim that is non-traditional." Court's Opinion at 1137 (citing, exclusively, cases in which the Court found no standing). I agree, in general. *But see, e.g., Orr v. Orr,* 440 U.S. 268, 99 S.Ct. 1102, 59 L.Ed.2d 306 (1979); *Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978); *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977) (all taking a generous view of, and upholding standing in "non-traditional" cases).

Curiously, also in passing, the majority suggests that this case is distinguishable from *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), because that case involved an exercise of "congressional power" while this one involves only "internal practices of *each* house of Congress." Court's Opinion at 1140 (emphasis in original). But the authority cited, *Valley Forge Christian College v. Americans United for*

*Separation of Church and State,* 454 U.S. 464, 479, 102 S.Ct. 752, 762, 70 L.Ed.2d 700 (1982), distinguishes between legislative ("congressional") *and executive* action. To the distinctions between actions legitimately taken in the legislative, executive, or judicial departments, my colleagues would apparently add a fourth category: legitimately legislative, but not "congressional."

5. *Cf.* Court's Opinion at 1145 (indicating that, at bottom, the issue Kurtz would air in court is properly branded a "political" matter rather than a matter "of law").

6. *See generally* Henkin, *Is There a "Political Question" Doctrine?,* 85 YALE L.J. 597 (1976).

7. *See, e.g.,* C. WRIGHT, HANDBOOK OF THE LAW OF FEDERAL COURTS 60 (4th ed. 1983) (commenting, in relation to vacillations in case law, that "[a]bout all that is certain on the subject is that the last word has not yet been written").

the issues he wishes to have adjudicated.... In other words, when standing is placed in issue in a case, the question is whether the person whose standing is challenged is a proper party to request an adjudication of a particular issue and not whether the issue itself is justiciable.

*Flast v. Cohen*, 392 U.S. 83, 99–100, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *see also, e.g.*, D. CURRIE, FEDERAL COURTS: CASES AND MATERIALS 71 (3d ed. 1982) (standing asks *who* is a proper party to litigate). If that clear statement is no longer operative, the Supreme Court and not my colleagues should be the tribunal to recall the declaration. *But see* Court's Opinion at 1140. Until instructed otherwise by Higher Authority, therefore, I remain persuaded that

clarity [is] gained by viewing standing as involving problems of the nature and sufficiency of the litigant's concern with the subject matter of the litigation, as distinguished from problems of the justiciability—that is, the fitness for adjudication—of the legal questions which he tenders for decision.

H. HART & H. WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 156 (P. Bator, P. Mishkin, D. Shapiro & H. Wechsler 2d ed. 1973).

The political question doctrine, to the extent that it still holds sway,[8] is—in contrast to "standing" law—unconcerned with the identity of the plaintiff and instead focuses on whether the *issue* is one appropriate for judicial determination. *E.g., Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939); *Goldwater v. Carter*, 444 U.S.

996, 1005–06, 100 S.Ct. 533, 538, 62 L.Ed.2d 428 (1979) (Rehnquist, J., concurring in the judgment) (questions properly characterized "political" are, regardless of the challenger, nonjusticiable—they may not be addressed by courts at all). My colleagues' concerns with Kurtz's issues are precisely those that the political question doctrine addresses. The most telling characteristic of a political question, under the Supreme Court's current formulation, is "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Defendants, as the majority indicates, *see* Court's Opinion at 1137, urge that the "constitutionally valid rules" of the Senate and House represent an exercise of authority textually committed by the Constitution to the legislative branch. *See* Brief of Appellee Halverson at 16–17; Brief for Appellees Baker and Ortega at 16–22. That is no doubt true, but who has the final say whether Congress' Rules are "constitutionally valid"?

The Constitution does indeed commit to each House the making of "the Rules of its proceedings," Article I, section 5, clause 2, and further provides that each House "shall chuse [its] Officers." Article I, section 2, clause 5 (House); Article I, section 3, clause 5 (Senate). But Congress' Rules and their implementation "may not ... ignore constitutional restraints or violate fundamental rights," and on that score— and that score only—they are subject to judicial review. *United States v. Ballin*, 144 U.S. 1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892).[9] In the case at hand, Congres.'

---

8. For modern applications, see *Gilligan v. Morgan*, 413 U.S. 1, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (Article I, section 8, clause 16 commits to Congress the authority to provide for "organizing, arming and disciplining the Militia"—now the National Guard); *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972) (Article I, section 5 commits to the Senate the final decision of which candidate "received more lawful votes" in an election for a Senate seat). *But cf.* Henkin, *supra* note 6.

9. Their "advantages or disadvantages," "wisdom or folly," of course, are not matters for judicial consideration. *United States v. Ballin*, 144 U.S.

1, 5, 12 S.Ct. 507, 509, 36 L.Ed. 321 (1892). This court has observed that the general rule that "there is no warrant for the judiciary to interfere with the internal procedures of Congress" applies "where constitutional rights are not violated." *Exxon Corp. v. FTC*, 589 F.2d 582, 590 (D.C.Cir.1978), *cert. denied*, 441 U.S. 943, 99 S.Ct. 2160, 60 L.Ed.2d 1044 (1979). *Cf. Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341, 1347–48 & n. 13 (D.C.Cir.1975) (stopping short of resting on "political question" abstention with respect to a House rule because of contention that the rule ignored constitutional restraints).

Rules and their implementation by the chaplains are not matters still open for judicial consideration, but that is so only because the Supreme Court has already settled the question *on the merits.* Accepting *Marsh,* it is not possible tenably to argue that the first amendment checks opening ceremonies of Congress consisting exclusively of prayer.

In sum, as best as I can gather from reading the majority opinion, my colleagues do not really question "the nature and sufficiency of [Kurtz's] concern with the subject matter of the litigation"; they are, instead, anxious about "the fitness for adjudication" of the questions he tenders for decision. *See supra* p. 1148. Their anxiety is unwarranted. The questions Kurtz raises have already been resolved by the Supreme Court, expressly or by clear implication, in *Marsh.* We need do no more— and should do no less—than say so.

### III.

Just as the majority would overlook Supreme Court jurisprudence and our own if it assumed that Congress' Rules and their implementation are immune from judicial review for constitutionality, *see supra* p. 1149 & n. 9, so it would neglect precedent if it supposed that the officers who do not make but merely execute congressional policy are the wrong persons to sue. That supposition, however, appears to infect Judge Buckley's "no causation" ruling. He states that unless Kurtz could plausibly allege that the chaplains "had the power to permit him to address the House and Senate in the manner he sought, the court could not conclude that the chaplains 'caused' appellant's exclusion." Court's Opinion at 1142.

The extraordinary view of "causation" that statement can be read to imply cannot seriously be entertained, for it is commonplace in our system to sue implementing officers, although—apart from the court's decree—they have (in Judge Buckley's words) no "discretion to grant [the suitor's] requests." *See id.* In *Powell v. McCormack,* 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), for example, Adam

Clayton Powell, Jr., challenged the constitutionality of a House resolution preventing him from taking his seat, although he was duly elected and met the age, citizenship, and residence requirements of Article I, section 2, clause 2. Powell named as defendants both members of Congress who voted for the resolution and congressional employees who implemented it. He alleged that the House Clerk refused to administer the oath, the Sergeant at Arms refused to pay him his salary, and the Doorkeeper threatened to deny him admission to the House chamber. The Supreme Court found that the Speech or Debate Clause required dismissal of the action against members of Congress, but did not bar proceeding against the congressional employees. If today's panel majority "no causation" reasoning were operative, however, then the Court in *Powell*—on its own initiative—should have dismissed the complaint against the employees for lack of standing for, unquestionably, the officers Powell named, like the chaplains here, lacked "discretion to grant [the suitor's] requests." *See also, e.g., Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984) (in constitutional challenge to Act of Congress, plaintiff properly sues Secretary charged with enforcement); *Marsh v. Chambers,* 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (in challenge to state legislature's prayer practice, plaintiff properly sues State Treasurer who provides funding); *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (in challenge to President's Executive Order, plaintiff properly sues cabinet officer who executed direction).

Were public officers not proper parties in a constitutional challenge to congressional measures—because such officers lack discretion to act in opposition to the legislature's directives—then most actions of Congress would be immune from judicial review. The Speech or Debate Clause would shelter members of Congress, and public officers, even if not protected by that clause, would drop out on "standing" grounds. This is surely not the law. Those who execute Congress' policy are

properly sued because they cause plaintiff an injury that is remedied when the judiciary declares the action unconstitutional. "[I]t is an 'inadmissible suggestion' that action might be taken in disregard of a judicial determination." *Powell,* 395 U.S. at 549 n. 86, 89 S.Ct. at 1978 n. 86, quoting *McPherson v. Blacker,* 146 U.S. 1, 24, 13 S.Ct. 3, 6, 36 L.Ed. 869 (1892).

Moreover, while acknowledging that "where a party's standing is challenged in a motion to dismiss, a reviewing court 'must construe the complaint in favor of the complaining party,'" Court's Opinion at 1138 (citing *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), the majority ignores or misperceives Kurtz's alternative plea, or reads that plea with a rigidity inconsonant with Rules 15 and 54(c) of the Federal Rules of Civil Procedure. The former rule provides that "leave [to amend a pleading] shall be freely given when justice so requires"; the latter calls for relief to which party "is entitled," even if not demanded in his pleading.

Kurtz did plead, in the alternative, for a funding cut-off, so long as Congress categorically excludes non-theists from opening the legislators' day. Joint Appendix at 20. In other words, Kurtz sought redress, through denial of funding for the chaplaincies, so long as those offices function in a manner he assails as unconstitutional. And it should be recalled that *Kurtz prevailed on standing,* although not on the merits, *in the district court.* With fair notice of Judge Buckley's "no causation" view, Kurtz might well have amended his complaint to fit a now familiar mold. Kurtz might have asserted this "equal, nonprotection" prayer (for relief): if non-theistic guests are excluded by the houses of Congress, each acting through its official chaplain, then theistic guests must be excluded too.

In *Heckler v. Mathews,* 465 U.S. 728, 104 S.Ct. 1387, 79 L.Ed.2d 646 (1984), to cite a recent example of the "equalize down" genre, a male plaintiff challenged a law that allocated Social Security benefits in a way that allegedly distinguished impermissibly on the basis of sex. The law contained a severability clause which provided that the relevant benefit would be *denied to everyone* in the event the challenged gender line was struck down. Thus, there was no way that the plaintiff could in fact receive the benefits for which he applied, even if his constitutional argument prevailed. Despite the unavailability of the sole affirmative relief plaintiff requested, the Supreme Court unanimously found standing to sue. The Court reasoned:

> [T]he right to equal treatment guaranteed by the Constitution [a right Kurtz plainly asserts in the case at hand] is not coextensive with any substantive rights to the benefits denied the party discriminated against. Rather, ... discrimination itself ... can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group. ... [W]hen the "right invoked is that to equal treatment," the appropriate remedy is a *mandate* of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class.... Because the severability clause would forbid only the latter and not the former kind of relief in this case, the injury caused by the unequal treatment allegedly suffered by [plaintiff] may "be redressed by a favorable decision," ... and [plaintiff] therefore has standing to prosecute this action.

*Heckler v. Mathews,* 465 U.S. at 739–40, 104 S.Ct. at 1395–96 (citations and footnotes omitted) (emphasis in original).[10]

Just as Mathews argued that, for Social Security pension purposes, government must be blind to classifications based on

---

**10.** Had there been no severability clause, the Secretary still would have lacked any "discretion" to grant [plaintiff Mathews] the benefits he sought." *Compare* Court's Opinion at 1144 *with, e.g., Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 2467, 45 L.Ed.2d 522 (1975) (constitutionality of statutory classification is a matter "beyond [the Secretary's] jurisdiction to determine").

sex, so Kurtz argues "that government must be blind to classifications based on theistic belief." If the negative decree prospect sufficed to establish standing in *Heckler v. Mathews,* that prospect should serve as well in the instant case. *See also Orr v. Orr,* 440 U.S. 268, 272, 99 S.Ct. 1102, 1108, 59 L.Ed.2d 306 (1979) (male plaintiff had standing to challenge one-way alimony, though he sought no alimony for himself, and likely would remain obligated to pay alimony even if he prevailed on his equal protection argument); *Stanton v. Stanton,* 421 U.S. 7, 17–18, 95 S.Ct. 1373, 1379, 43 L.Ed.2d 688 (1975) (although prevailing on federal constitutional issue, appellant "may or may not ultimately win her law suit").

The majority furthermore reports its recognition that "the court cannot adjudicate the merits of [a] constitutional claim at the jurisdictional threshold." Court's Opinion at 1142. Under its analysis, therefore, Kurtz would fail on "causation" whatever the categorical nature of his exclusion—his nontheistic belief, *cf. Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807–08, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in result), his religious creed, his race, his national origin, or his sex. Suppose, for example, that the House or Senate directed its chaplain to invite only Protestant ministers, only Baptists, only clergy who are white, male, and born in the U.S.A. According to the majority, no cleric in an excluded category would have standing to complain. The precedent canvassed in *Heckler v. Mathews,* 465 U.S. at 737–40, 104 S.Ct. at 1394–95, however, points precisely in the opposite direction.

### CONCLUSION

For the reasons stated, I must dissent from the extraordinary "standing" disposi-

tion the court has announced.[11] However, after *Marsh,* it is evident that Kurtz has stated no federal question of genuine substance.[12] On that basis, I would affirm the district court's decision.

---

11. *All* defendant-appellees, I note, sought affirmance, not vacation, of the district court's decision. *See* Brief for Appellees Baker and Ortega at 37; Brief of Appellee Halverson at 17; Brief for Appellee Ford at 30 (district court's final judgment was correct).

12. Because the issue on the merits has been securely settled by the Supreme Court, there is no occasion in this case to indulge in any "passive virtue." *Compare* Bickel, *The Supreme*

Court, 1960 Term—Foreword: The Passive Virtues, 75 HARV.L.REV. 40, 42 (1961) (including among "passive virtues"—devices available to the Supreme Court to avoid decision of discomforting constitutional issues—"standing," "case and controversy," "ripeness," and "political question") *with* Gunther, *The Subtle Vices of the "Passive Virtues"—A Comment on Principle and Expediency in Judicial Review,* 64 COLUM.L.REV. 1 (1964).