Opinion for the Court filed by Circuit Judge RANDOLPH.
Concurring opinion filed by Circuit Judge GRIFFITH.
Dissenting opinion filed by Circuit Judge SENTELLE, in which Circuit *575 Judges ROGERS, TATEL and GARLAND join and Circuit Judge GRIFFITH joins as to Part I.
RANDOLPH, Circuit Judge.
Both parties to this casé are members of the United States House of Representatives. John A. Boehner, the plaintiff, represents Ohio’s Eighth District. James A. McDermott, the defendant, represents Washington’s Seventh District. The complaint alleged that Representative McDer-mott violated 18 U.S.C. § 2511(l)(c) when he disclosed a tape recording of an illegally intercepted conversation in which Representative Boehner participated.
In our initial decision in this case, we held that Representative McDermott did not have a First Amendment right to disclose the tape. Boehner v. McDermott, 191 F.3d 463 (D.C.Cir.1999). The Supreme Court vacated our decision and returned the case to us for further consideration in light of Bartnicki v. Vopper, 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787 (2001). See 532 U.S. 1050, 121 S.Ct. 2190, 149 L.Ed.2d 1022 (2001). We remanded the case to the district court. After the parties engaged in discovery, the district court granted summary judgment in favor of Representative Boehner, awarding him $ 10,000 in statutory damages, see 18 U.S.C. § 2520(c)(2), $ 50,000 in punitive damages, and reasonable attorney’s fees and costs. A panel of this court, with one judge dissenting, affirmed on the ground that Representative McDermott had not lawfully obtained the tape recording. Boehner v. McDermott, 441 F.3d 1010 (D.C.Cir.2006). We vacated that decision and ordered the case reheard en banc. Boehner v. McDermott, No. 04-7203 (D.C.Cir. June 23, 2006) (order granting rehearing en banc).
I.
On remand, the record developed in discovery showed the following.
On December 21, 1996, Representative Boehner participated in a conference call with members of the Republican Party leadership, including then-Speaker of the House Newt Gingrich. At the time of the conversation Gingrich was the subject of an investigation by the House Committee on Standards of Official Conduct, commonly known as the House Ethics Committee. Representative Boehner was chairman of the House Republican Conference. The participants discussed how they might deal with an expected Ethics Committee announcement of Gingrich’s agreement to accept a reprimand and to pay a fine in exchange for the Committee’s promise not to hold a hearing.
Representative Boehner was in Florida when he joined the conference call. He spoke from a cellular telephone in his car. John and Alice Martin, who lived in Florida, used a police radio scanner to eavesdrop on the conversation, in violation of 18 U.S.C. § 2511(l)(a). They recorded the call and delivered the tape in a sealed envelope to the Florida office of then-Representative Karen Thurman. Staff members forwarded the envelope to Thurman’s Washington office. On January 8, 1997, Thurman’s chief of staff learned that the Martins would be visiting the Washington office. Both Thurman and her chief of staff sought legal advice about accepting the tape, presumably because they knew of its contents and how it had been recorded. At some point they consulted then-Representative David Bonior’s chief of staff and legislative director. Stan Brand, former General Counsel to the House of Representatives, advised that the tape should not be accepted under any circumstances and that it should be turned over to the Ethics Committee or other appropriate au *576 thorities. When the Martins arrived at Thurman’s office, her chief of staff returned the tape in its unopened envelope and suggested they turn it over to the Ethics Committee.
At about 5 p.m. on January 8, 1997, in a small anteroom adjacent to the Ethics Committee hearing room, the Martins delivered the tape to Representative McDer-mott in a sealed 8-1/2" by 11" envelope. At the time, Representative McDermott was the ranking Democrat on the Ethics Committee. With the envelope the Martins also delivered a business card and a typed letter dated January 8, 1997, and addressed to “Committee On Standards of Official Conduct ... Jim McDermott, Ranking Member.” The letter read:
Enclosed in the envelope you will find a tape of a conversation heard December 21, 1996 at about 9:45 a.m. The call was a conference call heard over a scanner. We felt the information included were [sic] of importance to the committee. We live in the 5th. Congressional District and attempted to give the tape to Congresswoman Karen Thurman. We were advised by her to turn the tape directly over to you. We also understand that we will be granted immunity. My husband and I work for Columbia County Schools in Columbia County Florida. We pray that committee will consider our sincerity in placing it in your hands.
We will return to our home today.
Thank you for your consideration.
John and Alice Martin
After conversing with the Martins, Representative McDermott accepted the envelope and returned to the Ethics Committee hearing room.
Later that evening, during a recess, Representative McDermott left the Ethics Committee hearing room and went to his office. There he opened the Martins’ envelope, emptied the contents, and listened to the tape. Still later, he called two reporters: Jeanne Cummings of The Atlanta Journal-Constitution, for whom he left a message, and Adam Clymer of The New York Times, whom he reached. Clymer went to Representative McDer-mott’s office, listened to the tape, and made a recording of it. Cummings returned Representative McDermott’s call the next day and came to his office and listened to the tape.
The contents of the tape had substantial news value. In particular, the tape revealed information bearing on whether Gingrich had violated his settlement agreement with the Ethics Committee. On January 10,1997, The New York Times published a front-page article by Clymer entitled “Gingrich Is Heard Urging Tactics in Ethics Case.” The article, which included lengthy excerpts of the recorded conversation, reported the circumstances leading to the disclosure of the tape:
The call was taped by people in Florida who were unsympathetic to Mr. Gingrich and who said they heard it on a police scanner that happened to pick up the cellular telephone transmissions of one of the participants. It was given to a Democratic Congressman, who made the tape available to The New York Times....
Mr. Gingrich, Mr. Bethune and the others discussed their tactics in a conference telephone call, a transcript of which was made available by a Democratic Congressman hostile to Mr. Gingrich who insisted that he not be identified further.
The Congressman said the tape had been given to him on Wednesday by a couple who said they were from northern Florida. He quoted them as saying it had been recorded off a radio scanner, *577 suggesting that one participant was using a cellular telephone. They said it was recorded about 9:45 A.M. on Dec. 21.
Adam Clymer, Gingrich Is Heard Urging Tactics in Ethics Case, N.Y. Times, Jan. 10, 1997, at Al, A20. The Atlanta Journal-Constitution ran a similar story the following day. See Jeanne Cummings, Gingrich Ethics Case: Panel Trusted His Motives, Gingrich Told GOP Allies, Atlanta J.-Const., Jan. 11,1997, at 6A.
On January 13, 1997, the Martins held a press conference and identified Representative McDermott as the congressman to whom they had delivered the tape. Representative McDermott then sent copies of the tape to the offices of the Ethics Committee and resigned from the Committee. The Committee Chairman, then-Representative Nancy Johnson, forwarded the tape to the Department of Justice. The government prosecuted the Martins for violating 18 U.S.C. § 2511(l)(a), which forbids unauthorized interception of “wire, oral, or electronic communication.” The Martins pled guilty and were fined $ 500.
On cross motions for summary judgment, the district court held that Representative McDermott violated 18 U.S.C. § 2511(l)(c) when he disclosed the tape to the reporters. Boehner v. McDermott, 332 F.Supp.2d 149, 158 (D.D.C.2004). Section 2511(l)(c) makes intentional disclosure of any illegally intercepted conversation a criminal offense if the person disclosing the communication knew or had “reason to know” that it was so acquired. The district court viewed the crucial issue to be whether Representative McDermott lawfully obtained the tape from the Martins. See id. at 163-64. The court held there was no genuine issue of material fact that the Martins’ letter to Representative McDermott had been outside of the envelope containing the tape and that Representative McDermott must have read it. Id. at 166-67, 169. This established that Representative McDermott, when he accepted the tape, knew the Martins had illegally intercepted the conversation and illegally disclosed it to him. It followed that he did not lawfully obtain the tape. Id. at 165-66, 169. On appeal, a divided panel of this court agreed that Representative McDermott obtained the tape unlawfully, but for reasons other than those the district court gave. 441 F.3d at 1016-17.
II.
This is an as-applied challenge to 18 U.S.C. § 2511(l)(c). The question therefore is whether Representative McDermott had a First Amendment right to disclose to the media this particular tape at this particular time given the circumstances of his receipt of the tape, the ongoing proceedings before the Ethics Committee, and his position as a member of the Committee. In answering this question we shall assume arguendo that Representative McDermott lawfully obtained the tape from the Martins.[1]
Whatever the Bartnicld majority meant by “lawfully obtain,” see 532 U.S. at 538, 121 S.Ct. 1753 (Breyer, J., joined by O’Connor, J., concurring), the decision does not stand for the proposition that anyone who has lawfully obtained truthful information of public importance has a First Amendment right to disclose that information. Bartnicki avoided laying down such a broad rule of law, see 532 U.S. at 528-29, 121 S.Ct. 1753, and for good reason. See Rodney A. Smolla, Informa *578 tion as Contraband: The First Amendment and Liability for Trafficking in Speech, 96 Nw. U.L. Rev. 1099, 1126-32 (2002). There are many federal provisions that forbid individuals from disclosing information they have lawfully obtained. The validity of these provisions has long been assumed. Grand jurors, court reporters, and prosecutors, for instance, may “not disclose a matter occurring before the grand jury.” Fed. R. Crim. P. 6(e)(2)(B). The Privacy Act imposes criminal penalties on government employees who disclose agency records containing information about identifiable individuals to unauthorized persons. See 5 U.S.C. § 552a(i)(l). The Espionage Act punishes officials who willfully disclose sensitive national defense information to persons not entitled to receive it. See 18 U.S.C. § 793(d). The Intelligence Identities Protection Act prohibits the disclosure of a covert intelligence agent’s identity. See 50 U.S.C. § 421. Employees of the Internal Revenue Service, among others, may not disclose tax return information. See 26 U.S.C. § 6103(a). State motor vehicle department employees may not make public information about an individual’s driver’s license or registration. See 18 U.S.C. § 2721. Employees of the Social Security Administration, as well as other government employees, may not reveal social security numbers or records. See 42 U.S.C. § 405(c)(2)(C)(viii)(I), (III).[2] Judicial employees may not reveal confidential information received in the course of their official duties. See Code of Conduct for Judicial Employees Canon 3D. And so forth.
In analogous contexts the Supreme Court has sustained restrictions on disclosure of information even though the information was lawfully obtained. The First Amendment did not shield a television station from liability under the common law right of publicity when it filmed a plaintiffs “human cannonball” act and broadcast the film without his permission. Zacchini v. Scripps-Howard Broad. Co., 433 U.S. 562, 575-79, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977). When a newspaper divulged the identity of an individual who provided information to it under a promise of confidentiality, the First Amendment did not provide the paper with a defense to a breach of contract claim. Cohen v. Cowles Media Co., 501 U.S. 663, 670, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). The First Amendment did not prevent the government from enforcing reasonable confidentiality restrictions on former employees of the CIA. See Snepp v. United States, 444 U.S. 507, 509-10, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). Parties to civil litigation did not “have a First Amendment right to disseminate, in advance of trial, information gained through the pretrial discovery process.” Seattle Times Co. v. Rhinehart, 467 U.S. 20, 22, 37, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984).
In United States v. Aguilar, 515 U.S. 593, 115 S.Ct. 2357, 132 L.Ed.2d 520 (1995), a case closely analogous to this one, the Supreme Court held that the First Amendment did not give a federal judge, who obtained information about an investigative wiretap from another judge, the right to disclose that information to the subject of the wiretap. The judge challenged his conviction for violating 18 U.S.C. § 2232(c), which prohibits the improper disclosure of an investigative wire *579 tap.[3] In rejecting his First Amendment claim, the Court wrote that the judge was not “simply a member of the general public who happened to lawfully acquire possession of information about the wiretap; he was a Federal District Court Judge who learned of a confidential wiretap application from the judge who had authorized the interception, and who wished to preserve the integrity of the court. Government officials in sensitive confidential positions may have special duties of nondisclosure.” [4] Id. at 605-06, 115 S.Ct. 2357.
Aguilar stands for the principle that those who accept positions of trust involving a duty not to disclose information they lawfully acquire while performing their responsibilities have no First Amendment right to disclose that information. The question thus becomes whether, in the words of Aguilar, Representative McDer-mott’s position on the Ethics Committee imposed a “special” duty on him not to disclose this tape in these circumstances. Bartnicki has little to say about that issue. The individuals who disclosed the tape in that case were private citizens who did not occupy positions of trust.
All members of the Ethics Committee, including Representative McDermott, were subject to Committee Rule 9, which stated that “Committee members and staff shall not disclose any evidence relating to an investigation to any person or organization outside the Committee unless authorized by the Committee.”[5] This rule recognizes the unique role of the Ethics Committee and reflects a desire “to protect the rights of individuals accused of misconduct, preserve the integrity of the investigative process, and cultivate collegiality among Committee members,” Staff of H. Ethics RefoRM Task Force, 105Th Cong., Report of the Ethios Reform Task Force on H. Res. 168, at 10-11 (Comm. Print 1997). All members of the House of Representatives were also subject to Rule 23 of the House Rules, which stated that “[a] Member ... shall adhere to the spirit and the letter of the Rules of the House and to the rules of duly constituted committees thereof.”
The House has the power to make and enforce such rules under the Rulemaking Clause of the Constitution, which states that “Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behaviour, and, with the Concurrence of two thirds, expel a Member,” U.S. Const, art. I, § 5, cl. 2. There is no question that the rules themselves are reasonable and raise no First Amendment concerns. Counsel for Representative McDermott conceded that the House could, consistent with the First Amendment, punish Representative McDermott if it determined he had violated its rules by releasing the Martins’ tape to the media.
If the First Amendment does not protect Representative McDermott from House disciplinary proceedings, it is hard to see why it should protect him from liability in this civil suit. Either he had a First Amendment right to disclose the *580 tape to the media or he did not. If he had the right, neither the House nor the courts could impose sanctions on him for exercising it. If he did not have the right, he has no shield from civil liability or from discipline imposed by the House. In that event, his civil liability would rest not on his breach of some ethical duty, but on his violation of a federal statute for which he had no First Amendment defense. The situation is the same as that in Aguilar. There the defendant-judge was punished not for violating his ethical duty to maintain judicial secrecy, but for violating the general prohibition on disclosing investigative searches.[6]
The only remaining question is whether the tape fell within Representative McDer-mott’s duty of confidentiality under the rules of the House and the Ethics Committee. Representative McDermott claims the tape did not fall within his duty of confidentiality because, rather than “internal Committee information,” it was a “recording of a conversation among persons outside the Committee received unsolicited from other persons outside the Committee.” Citing United States v. Rostenkowski, 59 F.3d 1291 (D.C.Cir.1995), he contends the rules are too ambiguous for the court to apply in this case. In Rostenkow-ski, we noted that “the Rulemaking Clause of Article I clearly reserves to each House of the Congress the authority to make its own rules.” Id. at 1306. When “a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the [House] itself.” Id. Thus, “a sufficiently ambiguous House Rule is non-justiciable.” Id.
Here we can be confident that the rules covered Representative McDermott’s handling of the tape. On December 8, 2006, the Ethics Committee adopted the report of the investigative subcommittee dealing with Representative McDermott’s disclosure of the tape. The report emphasized “the unique charter of the Committee to conduct its work in a non-partisan manner, and the threat posed to the integrity of the House of even the appearance of unfairness to Members under investigation or of bias or impartiality by Members of the Committee.” In re Representative James McDermott, H.R. Rep. No. 109-732, at 17 (2006). After discussing Committee Rule 9 and House Rule 23, among other rules, the report concluded “Representative McDermott’s conduct, i.e., his disclosure to the news media of the contents of the tape furnished to him by the Martins, was inconsistent with the spirit of the applicable rules and represented a failure on his part to meet his obligations as Ranking Minority Member of the House Select Committee on Ethics.” Id. at 16. The report said Representative McDermott should have “entrusted] the Committee at the outset with the information to which he alone on the Committee had access.” Id. at 17.
We agree with and accept the Ethics Committee’s interpretation of the rules as applied to this case, and thereby eliminate the concerns mentioned in Rostenkowski.[7] *581 When Representative McDermott became a member of the Ethics Committee, he voluntarily accepted a duty of confidentiality that covered his receipt and handling of the Martins’ illegal recording. He therefore had no First Amendment right to disclose the tape to the media.

Affirmed.

. Chief Judge Ginsburg and Judges Henderson, Randolph, and Brown believe that, for the reasons given in the second panel opinion in this case, Representative McDer-mott did not lawfully obtain the tape. See 441 F.3d at 1016.

. The government can also limit disclosures by persons who are not its employees without running afoul of the First Amendment. Private attorneys who reveal their clients’ confidences may be punished for doing so. And those who sell or rent video tapes or DVDs ordinarily may not reveal “personally identifiable information concerning” their customers. See 18 U.S.C. § 2710(b).

. The equivalent provision is currently codified at § 2232(d).

. See Code of Conduct for United States Judges Canon 5C(8): “Information acquired by a judge in the judge's judicial capacity should not be used or disclosed by the judge in financial dealings or for any other purpose not related to the judge’s judicial duties.”

. Under House Rule 10, clause 4(e)(3) of the 105th Congress, the special proceedings dealing with Gingrich proceeded under the rules applicable to the 104th Congress. Thus, although Representative McDermott disclosed the tape during the 105th Congress, the applicable rule was that of the 104th Congress.

. The code of conduct applicable to federal judges is not judicially enforceable; its commentary states that "the Code is not designed or intended as a basis for civil liability or criminal prosecution." Code of Conduct for United States Judges Canon 1 cmt. Nevertheless, the Supreme Court in Aguilar essentially took notice of the applicable standard of conduct in deciding that the defendant-judge had no First Amendment defense to criminal liability for disclosing a wiretap. See 515 U.S. at 605-06, 115 S.Ct. 2357.

. Representative McDermott makes much of the fact that the investigative subcommittee did not adopt a Statement of Alleged Violation under Committee Rule 19(f) of the Ethics Committee, but rather issued a report under Committee Rule 19(g) without recommending further disciplinary proceedings. We cannot *581 see why this matters. The subcommittee reached conclusions adverse to Representative McDermott, finding that his disclosure of the tape not only violated the spirit of the rules but also violated "his obligations as Ranking Minority Member.” In re Representative James McDermott, H.R. Rep. No. 109-732, at 16 (2006). The Committee ratified the subcommittee’s findings, adopting the report “as the Report of the full Committee.” See COMMITTEE ON STANDARDS OF OFFICIAL CONDUCT, Summary of Activities, H.R. Rep. No. 109-744, pt. VII (2007). The Committee necessarily believed that it had authority to act as it did, and "the rules of a particular committee are for that committee to interpret.” Lewis Des-chler & William Holmes Brown, Procedure in the U.S. House of Representatives, 97Th Congress, ch. 17 § 11.1 (4th ed. 1982).