# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 18, 2018        Decided April 19, 2019

No. 17-5278

DANIEL BARKER,
APPELLANT

v.

PATRICK CONROY, CHAPLAIN, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-00850)

———

*Andrew Seidel* argued the cause for appellant. On the briefs was *Richard L. Bolton*. *Anita T. Gallucci* entered an appearance.

*Alison Gill* was on the brief for *amici curiae* The Center for Inquiry and American Atheists in support of appellant.

*Gregory M. Lipper* was on the brief for *amici curiae* Representatives Mark Pocan, Jared Huffman, and Jamie Raskin in support of appellant and reversal.

*Richard B. Katskee*, *Alex J. Luchenitser*, and *Jeffrey I. Pasek* were on the brief for *amici curiae* Americans United for

Separation of Church and State, et al. supporting appellant and reversal.

*Monica L. Miller* was on the brief for *amicus curiae* The American Humanist Association in support of appellant.

*Thomas G. Hungar*, General Counsel, U.S. House of Representatives, argued the cause and filed the brief for appellees. *Matthew M. Collette* and *Lowell V. Sturgill Jr.*, Attorneys, U.S. Department of Justice, entered appearances.

*Mike Hunter*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Mithun Mansinghani*, Solicitor General, *Steve Marshall*, Attorney General, Office of the Attorney General for the State of Alabama, *Leslie Rutledge*, Attorney General, Office of the Attorney General for the State of Arkansas, *Mark Brnovich*, Attorney General, Office of the Attorney General for the State of Arizona, *Cynthia H. Coffman*, Attorney General, Office of the Attorney General for the State of Colorado, *Christopher M. Carr*, Attorney General, Office of the Attorney General for the State of Georgia, *Doug Peterson*, Attorney General, Office of the Attorney General for the State of Nebraska, *Michael DeWine*, Attorney General, Office of the Attorney General for the State of Ohio, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, *Ken Paxton*, Attorney General, Office of the Attorney General for the State of Texas, *Sean D. Reyes*, Attorney General, Office of the Attorney General for the State of Utah, *Patrick Morrisey*, Attorney General, Office of the Attorney General for the State of West Virginia, *Brad Schimel*, Attorney General, Office of the Attorney General for the State of Wisconsin, *Lawrence G. Wasden*, Attorney General, Office of the Attorney General for the State of Idaho, *Curtis T. Hill*, *Jr.*, Attorney General, Office of the Attorney General for the State of Indiana, *Derek Schmidt*, Attorney General, Office of

the Attorney General for the State of Kansas, *Jeff Landry*, Attorney General, Office of the Attorney General for the State of Louisiana, and *Tim Fox*, Attorney General, Office of the Attorney General for the State of Montana, were on the brief for *amici curiae* The States of Oklahoma, et al. in support of appellees.

*Eric S. Baxter* was on the brief for *amici curiae* Aleph Institute, et al. in support of defendants-appellees and affirmance.

*Jonathan A. Scruggs*, *Kristen K. Waggoner*, *David A. Cortman*, and *Nathaniel P. Bruno* were on the brief for *amici curiae* 48 Members of Congress in support of appellees and affirmance.

*Steffen N. Johnson*, *John W.H. Harding*, *Paul N. Harold*, and *Stephanie A. Maloney* were on the brief for *amici curiae* Jewish Coalition for Religious Liberty, et al. supporting appellees and affirmance.

Before: TATEL, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Since 1789, the House of Representatives has begun each legislative day with a prayer, a practice the Supreme Court has found compatible with the Establishment Clause. *See generally Marsh v. Chambers*, 463 U.S. 783 (1983). Although a House-appointed chaplain has traditionally delivered the opening prayer, at some time in the past the House began allowing members to nominate other individuals to give a prayer as "guest chaplain." This case arose when a member of the House asked the Chaplain, Father

Patrick J. Conroy, to invite Daniel Barker—a former Christian minister turned atheist—to serve as guest chaplain and deliver a secular invocation. Conroy denied the request, and Barker sued, alleging that Conroy unconstitutionally excluded him from the guest chaplain program because he is an atheist. The district court dismissed Barker's Establishment Clause claim for lack of Article III standing and for failure to state a claim. Although we find that Barker has standing to challenge his exclusion from the program, we affirm the district court's dismissal because he has failed to state a claim upon which relief can be granted.

## I.

Because this case comes to us on appeal from the district court's grant of a motion to dismiss, "we must accept as true all material allegations of the complaint, drawing all reasonable inferences from those allegations in" Barker's favor. *LaRoque v. Holder*, 650 F.3d 777, 785 (D.C. Cir. 2011) (internal quotation marks omitted). Viewed through that lens, the complaint relates the following.

House of Representatives Rule II, clause 5 provides that "[t]he Chaplain shall offer a prayer at the commencement of each day's sitting of the House." H.R. Doc. No. 114-192, Rule II, cl. 5 (2017). The House also allows guest chaplains to deliver the opening prayer, although the chamber's rules make no provision for that practice. In the last fifteen years, guest chaplains have delivered approximately forty percent of all invocations. The House's Office of the Chaplain approves guest chaplains and coordinates their visits. Between 2000 and 2015, although the vast majority of individuals allowed to deliver opening prayers were Christian, the House also welcomed guest chaplains of the Muslim, Jewish, and Hindu faiths. The House has never had an openly atheist or agnostic guest chaplain.

In 2014, Daniel Barker sought to be the first self-professed atheist to serve as guest chaplain. Barker is co-president of the Freedom From Religion Foundation, "a non-profit that promotes non-belief and works to keep state and church separate." Complaint for Declaratory and Injunctive Relief ("Compl.") ¶ 13. Ordained to the Christian ministry in the mid-1970s, Barker spent nearly twenty years as a pastor and missionary before he "'lost faith in faith' and became an atheist." *Id.* ¶ 16. Although "nonreligious," *id.* ¶ 4, Barker "views the opportunity to give an invocation [before the House] . . . as a great honor and an opportunity to participate in solemnizing the venerable work of the U.S. government," *id.* ¶ 67.

When the Freedom From Religion Foundation first inquired about the possibility of Barker delivering an invocation, the House Chaplain's Office explained that, although the program has no written rules, guest chaplains are permitted to give invocations only if they meet three requirements: "(1) they are sponsored by a member of the House, (2) they are ordained, and (3) they do not directly address House members and instead address a 'higher power.'" *Id.* ¶ 35. Barker easily satisfied the first two requirements: his congressman, Representative Mark Pocan, agreed to sponsor him, and Barker provided the Chaplain's Office with his ordination certificate. Demonstrating that he could also satisfy the third requirement, Barker sent the Chaplain's Office a copy of his draft secular invocation, which invoked "the 'higher power' of *human* wisdom," but no God or other religious higher power. Compl., Ex. B.

Four months passed without word from the Chaplain's Office. Asked about the delay, a Chaplain's Office employee responded that the Office "did not think [Barker's] requests

were 'genuine.'" *Id.* ¶ 46. Then, in December 2015, the Chaplain's Office formally rejected Barker's application because he "was ordained in a denomination in which he no longer practices." *Id.* ¶ 111 (internal quotation marks omitted). Conroy repeated this explanation in a January 2016 letter to Representative Pocan, which he began by "[l]eaving aside" two questions: "(i) whether the 'secular invocation' that . . . Mr. Barker proposed to deliver would constitute a 'prayer' within the meaning of the House Rules, and (ii) if not, whether [Conroy] could permit Mr. Barker to deliver such an invocation consistent with [his] responsibilities under the House Rules." Compl., Ex. C at 1. Conroy went on to explain that he was "unable to accede to [Pocan's] recommendation for a more basic, threshold reason": as a "'Minister Turned Atheist'" and "author of several books that concern his parting with his religious beliefs," Barker did not meet the "long-standing requirement" that all guest chaplains "be ordained by a recognized body in the faith in which [they] practice[]." *Id.* at 1–2.

Barker sued Conroy and several others, including the House of Representatives and then-Speaker Paul Ryan, alleging violations of the First Amendment's Establishment Clause, among other claims. In his complaint, he presented several different, albeit related, theories as to how Conroy's actions violated the Establishment Clause. Barker first alleged that Conroy's unwritten requirements that guest chaplains be ordained and address a higher power create a preference for religion over nonreligion and "discriminate against those whose religious beliefs do not include a belief in a supernatural higher power [and] those who practice a religion that does not have ordinations." Compl. ¶ 160. Next, Barker contended that Conroy unevenly enforces those requirements "in a manner that excludes atheists and other minority religions." *Id.* ¶ 161. Specifically, Barker asserted that the Chaplain's Office "has

not enforced the same requirements against other, religious applicants" for the guest chaplain program. *Id.* ¶ 119. Finally, Barker alleged that Conroy's reasons for excluding him from the program were pretextual and that Conroy actually denied him the opportunity to serve as guest chaplain simply because he is an atheist. Barker sought broad declaratory and injunctive relief as well as a writ of mandamus requiring Conroy to allow him to deliver an invocation "as soon as possible." *Id.* at 28.

Conroy moved to dismiss on the grounds that Barker lacked Article III standing and that the case was nonjusticiable under the political question doctrine and the Speech or Debate Clause of the U.S. Constitution. On the merits, Conroy argued that Barker failed to state a claim for which relief could be granted under the Establishment Clause.

The district court granted the motion to dismiss. Although it found Barker's suit barred by neither the political question doctrine nor the Speech or Debate Clause, it concluded that Barker lacked Article III standing to pursue his Establishment Clause claim. Specifically, the district court determined that Barker failed to establish that Conroy caused his claimed injuries because Barker never alleged that the House Chaplain had authority to permit him to deliver a secular invocation during the time reserved for prayer. In the alternative, the district court concluded that Barker failed to state an Establishment Clause claim because his suit was effectively "a challenge to the ability of Congress to open with a prayer." *Barker v. Conroy*, 282 F. Supp. 3d 346, 364 (D.D.C. 2017). Such a challenge, the court explained, was foreclosed by the Supreme Court's endorsement of legislative prayer in both *Marsh v. Chambers* and *Town of Greece v. Galloway*, 572 U.S. 565, 570 (2014) (holding that the practice of opening town board meetings with a sectarian prayer that was often Christian did not violate the Establishment Clause).

On appeal, Barker pursues only his Establishment Clause claim against Conroy in his official capacity. Our review is de novo. *See Washington Alliance of Technology Workers v. U.S. Department of Homeland Security*, 892 F.3d 332, 339 (D.C. Cir. 2018) ("We review the district court's dismissal of a complaint for lack of standing or for failure to state a claim *de novo*.").

Before we proceed to that review, however, a final note is in order. The record regarding the undisputed facts in this case is somewhat unusual given that, since Barker filed his complaint, Conroy has clarified that the House interprets its rules to require a religious prayer. As explained above, when Conroy rejected Barker's application to serve as guest chaplain, he expressly "le[ft] aside the question[] of . . . whether the 'secular invocation' that . . . Mr. Barker proposed to deliver would constitute a 'prayer' within the meaning of the House Rules." Compl., Ex. C at 1. Instead, Conroy told Representative Pocan, Barker was disqualified for the "more basic, threshold reason" that he is not "ordained by a recognized body in the faith in which he[] practices." *Id.* at 1–2.

But during the course of this litigation, Conroy has taken a different position: that Barker could not serve as guest chaplain because he sought to give a secular prayer. More important, the House of Representatives itself, through House counsel, has now ratified that position. Both in briefing and at oral argument, House counsel represented to this court that the House interprets its rules to require "a *religious* invocation." Appellees' Br. 39. "What I'm saying," counsel explained at oral argument, "and what the House is saying, and has authorized me to say . . . is, as explained in our briefs below and in this court, that persons who desire to deliver a secular

invocation in lieu of a prayer, as the House interprets its prayer rule and has consistently applied it for 225 years, are not entitled to do so." Oral Arg. Rec. 38:32–39:01. Barker, who seeks to deliver a nonreligious prayer, counters that legislative prayer need not be religious, but he nowhere disputes House counsel's representation that the House interprets its rules to require a religious prayer. *See* Reply Br. 5 ("Father Conroy . . . argue[s] that legislative invocations necessarily must be religious in substance and purpose."). As we shall explain below, although House counsel's representation is irrelevant to Barker's Article III standing, it is critical to the merits of this case.

## II.

As "the party invoking federal jurisdiction," Barker "bears the burden of establishing" Article III standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To satisfy that burden, Barker must allege facts demonstrating that he "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* At the pleading stage— the situation here—the plaintiff is "required only to 'state a *plausible* claim' that each of the standing elements" existed at the time the complaint was filed. *Attias v. Carefirst, Inc.*, 865 F.3d 620, 625 (D.C. Cir. 2017) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)); *see also Wheaton College v. Sebelius*, 703 F.3d 551, 552 (D.C. Cir. 2012) ("[S]tanding is assessed at the time of filing . . . ."). For purposes of the standing inquiry, we assume Barker would succeed on the merits of his claim. *See Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) ("[I]n reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims." (internal quotation marks omitted)).

In concluding that Barker lacked Article III standing based on a failure to plausibly allege causation, the district court relied on this court's decision in *Kurtz v. Baker*, which addressed a challenge to the House and Senate Chaplains' refusal to allow a secular humanist to deliver nonreligious remarks as a "guest speaker" during the period reserved for morning prayer. 829 F.2d 1133, 1134 (D.C. Cir. 1987). We concluded that the plaintiff's claimed exclusion injury—his inability to address the House or Senate—was not fairly traceable to the chaplains' refusal to allow him to deliver secular remarks during the time set aside for prayer "because (1) there [was] no allegation that the chaplains had discretion to grant [his] requests, and (2) such an allegation would in any event [have been] untenable." *Id.* at 1142.

This case is very different. In *Kurtz*, the plaintiff had no intention of delivering a prayer, seeking instead to "address [the House and Senate] '[o]n behalf of the Council for Democratic and Secular Humanism.'" *Id.* at 1135 (second alteration in original) (quoting Letter from Dr. Kurtz to Rev. Halverson (Feb. 13, 1984); Letter from Dr. Kurtz to Rev. Ford (Feb. 13, 1984)). Kurtz "'request[ed] the opportunity to appear as a guest speaker and to open a daily session . . . with a short statement in which [he] would remind the [members of the Senate and the House] of their moral responsibilities.'" *Id.* (alterations in original) (quoting Letter from Dr. Kurtz to Rev. Halverson; Letter from Dr. Kurtz to Rev. Ford). He "advised both chaplains that he would not utter a prayer if invited." *Id.* By contrast, Barker has never said that he is unwilling to utter a prayer, saying instead that the invocation he wishes to give is "secular." *See, e.g.*, Compl., Ex. A ("[Barker] intends for his invocation to be secular . . . ."); *see also Invocation*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1997) (defining "invocation" as "a prayer of entreaty (as at the beginning of a service of worship)"); Oral Arg. Rec. 0:58–1:12 (Barker's

counsel: "Dan Barker was invited by his representative to do something hundreds of other individuals have done: deliver a *prayer* at the U.S. House of Representatives. In his *prayer*, Barker wanted to invoke unifying and solemn themes . . . ." (emphases added)).

Although, historically, prayers delivered in the House have been religious, the rules themselves refer only to "prayer"; they make no distinction between religious and secular prayer. *See* H.R. Doc. No. 114-192, Rule II, cl. 5 ("The Chaplain shall offer a prayer at the commencement of each day's sitting of the House."); *id.* Rule XIV, cl. 1 (listing "[p]rayer by the Chaplain" as the first order of business). And, as a matter of ordinary usage, it is at least plausible that the word "prayer" encompasses a secular invocation. *See Prayer*, *Webster's Third New International Dictionary* (2002) (defining "prayers" as "earnest good wishes"); *Prayer*, Thomas Dyche & William Pardon, *A New General English Dictionary: Peculiarly Calculated for the Use and Improvement of Such as Are Unacquainted with the Learned Languages* (14th ed. 1771) (defining "prayer" as "an earnest request, desire, or petition put up to God, *or some other person or persons*" (emphasis added)). To be sure, through House counsel, Conroy now insists that a "prayer," as contemplated by the House rules, must be religious. But Conroy offered that interpretation only *after* Barker filed his complaint and, as noted above, standing is assessed at the time of filing. *See supra* at 9. Indeed, when Conroy rejected Barker's application, he expressly "le[ft] aside the question[] of . . . whether the 'secular invocation' that . . . Mr. Barker proposed to deliver would constitute a 'prayer' within the meaning of the House Rules." Compl., Ex. C at 1. Instead, he explained, he was unable to allow Barker to serve as guest chaplain "for a more basic, threshold reason." *Id.* Moreover, in contrast to *Kurtz,* where "there [was] no allegation that the chaplains had discretion to grant [the

plaintiff's] requests," 829 F.2d at 1142, Barker's complaint contains factual allegations that Conroy, apparently without objection from members of the House, has allowed certain guest chaplains to deliver prayers that did not invoke a divine power. *See* Compl. ¶¶ 146–151. Accepting Barker's well-pleaded factual allegations as true and drawing "all reasonable inferences" in Barker's favor, *LaRoque*, 650 F.3d at 785, we therefore conclude it was at least plausible at the time Barker filed his complaint that Conroy had discretion and authority under the House rules to grant his request to deliver a secular invocation.

Barker easily satisfies the other requirements for Article III standing. His inability to deliver a secular prayer before the House as a result of his exclusion from the guest chaplain program qualifies as a cognizable injury in fact, *see Kurtz*, 829 F.2d at 1142, and that injury would be redressed by a decision declaring the current practice unconstitutional and ordering Conroy to "schedule Barker to give an invocation as soon as possible," Compl. at 28. That said, to the extent Barker seeks relief untethered to his particular injury—he challenges other, more general aspects of the guest chaplain program, such as "the requirement that guest chaplains be ordained and practicing in the religion in which they were ordained," *id.* ¶ 157, and the alleged exclusion of all "atheists and other nonreligious individuals from the position of guest chaplain," *id.* at 27—he has standing to request such relief only on behalf of himself and those who, like him, desire to deliver a secular prayer. *See, e.g.*, *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990) ("Article III denies federal courts the power 'to decide questions that cannot affect the rights of litigants in the case before them.'" (quoting *North Carolina v. Rice,* 404 U.S. 244, 246 (1971) (per curiam))).

Nor does Barker's Establishment Clause claim present a nonjusticiable political question. A claim raises such a question if it involves "a textually demonstrable constitutional commitment of the issue to a coordinate political department." *Baker v. Carr*, 369 U.S. 186, 217 (1962). Conroy argues that Barker's claim does just that, as it "involves the textually demonstrable constitutional commitment of exclusive authority to the House to 'determine the Rules of its Proceedings.'" Appellees' Br. 29 (quoting U.S. Const. art. I, § 5, cl. 2). But even accepting the belated contention that the House defines "prayer" as *religious* prayer—a qualification that, once again, appears nowhere in the text of the House rules—Barker's Establishment Clause claim remains justiciable. As the Supreme Court has long held, although "the [C]onstitution empowers each house to determine its rules of proceedings," Congress "may not by its rules ignore constitutional restraints or violate fundamental rights." *United States v. Ballin*, 144 U.S. 1, 5 (1892); *see also Vander Jagt v. O'Neill*, 699 F.2d 1166, 1173 (D.C. Cir. 1983) ("Article I does not alter our judicial responsibility to say what rules Congress may not adopt because of constitutional infirmity."). In this case, rather than challenging the House rules themselves, Barker argues that any interpretation or application of the rules that prevents atheists from serving as guest chaplains violates the Establishment Clause. But just as the Rulemaking Clause gives Congress no license to adopt unconstitutional rules, it provides no cover for the House to unconstitutionally interpret or apply its rules.

The Speech or Debate Clause likewise poses no bar to Barker's claim, even assuming legislative immunity could ever extend to the House Chaplain. Declaring that "Senators and Representatives . . . for any Speech or Debate in either House . . . shall not be questioned in any other Place," U.S. Const. art. I, § 6, cl. 1, that clause immunizes both legislators

and their aides from criminal and civil suits arising out of "legislative acts," *Rangel v. Boehner*, 785 F.3d 19, 23 (D.C. Cir. 2015) (internal quotation marks omitted); *see also Gravel v. United States*, 408 U.S. 606, 618 (1972) ("[T]he Speech or Debate Clause applies not only to a Member but also to his aides insofar as the conduct of the latter would be a protected legislative act if performed by the Member himself."). In order to ensure "that the legislative function the Constitution allocates to Congress may be performed independently," *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 502 (1975), we "have extended the privilege to matters beyond pure speech or debate in either House, but only when necessary to prevent indirect impairment of such deliberations," *Gravel*, 408 U.S. at 625 (internal quotation marks omitted). Accordingly, the Clause's protections extend to acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Id.*

Unlike acts protected by the Speech or Debate Clause—such as voting and other committee activities like "authorizing an investigation, holding hearings, preparing a report, and authorizing the publication and distribution of that report," *United States v. Rose*, 28 F.3d 181, 187–88 (D.C. Cir. 1994) (internal quotation marks omitted)—legislative prayer is not "an integral part of the deliberative and communicative process[]," *Gravel*, 408 U.S. at 625; *see also Kurtz*, 829 F.2d at 1146 n.2 (Ginsburg, R.B., J., dissenting) ("While inspirational, prayer in Congress does not appear to be integral to lawmaking." (internal quotation marks omitted)). Although the Supreme Court has instructed us to "read the Speech or Debate Clause broadly to effectuate its purposes," *Eastland*,

421 U.S. at 501, the Clause's "shield does not extend beyond what is necessary to preserve the integrity of the legislative process," *United States v. Brewster*, 408 U.S. 501, 517 (1972). Because Barker's challenge to Conroy's administration of the guest chaplain program presents no apparent threat to lawmakers' independence, the Speech or Debate Clause offers Conroy no immunity from Barker's Establishment Clause challenge. *See Gravel*, 408 U.S. at 618 (describing the "fundamental purpose" of the Clause as "freeing the legislator from executive and judicial oversight that realistically threatens to control his conduct as a legislator").

Nothing in *Consumers Union of United States, Inc. v. Periodical Correspondents' Ass'n*, 515 F.2d 1341 (D.C. Cir. 1975), requires a different result. There we rejected as nonjusticiable an organization's challenge to the denial of its application for admission to the House and Senate press galleries because the denial fell "within the spheres of legislative power committed to the Congress and the legislative immunity granted by the Constitution." *Id.* at 1351. We first observed that the entity responsible for denying the organization's application, the Executive Committee of the Periodical Correspondents' Association (the "Association"), had acted pursuant to internal congressional rules governing admission to the galleries. *Id.* at 1347, 1350. Because the Constitution expressly reserves to the legislative branch the power to make its own internal rules, we explained, Congress's "power over [its] internal proceedings . . . in itself would appear to establish the nonjusticiability of this cause were it not for the contention that" the rule at issue—and the Association's interpretation of it—"infringed upon [the organization's] constitutional rights." *Id.* at 1347–48; *see also Ballin*, 144 U.S. at 5 (Congress "may not by its rules ignore constitutional restraints or violate fundamental rights"). We then "turn[ed] to the effect of the Speech or Debate Clause to settle whether

despite the claim of constitutional violation . . . [the] case [was] yet nonjusticiable," *Consumers Union*, 515 F.2d at 1348, ultimately concluding that the Association's denial of the organization's application "fell within the sphere of legislative activity" protected by the Clause, *id.* at 1350 (internal quotation marks omitted). Essential to that determination was the fact that Congress itself had developed the press gallery rules to protect legislators' independence: Congress designed the rules to ensure that the galleries would "be used by bona fide reporters who [would] not abuse the privilege of accreditation by importuning Members on behalf of private interests or causes." *Id.* at 1347. As we explained in a later case, because the Association's denial of the organization's application involved "regulation of the very atmosphere in which *lawmaking deliberations* occur," the Speech or Debate Clause barred us from hearing the suit. *Walker v. Jones*, 733 F.2d 923, 930 (D.C. Cir. 1984) (emphasis added).

Unlike the plaintiff organization in *Consumers Union*, Barker does not mount a facial challenge to the House's rules and, even if he did, the political question doctrine would pose no bar to such a suit. *See supra* at 13. Moreover, any rules pertaining to the opening prayer—an event that occurs at the very beginning of the legislative session before any deliberating whatsoever—could not similarly be said to regulate "the very atmosphere in which lawmaking deliberations occur." *Walker*, 733 F.2d at 930. The Supreme Court itself has described legislative prayer not as a part of the legislative process, but rather as a "symbolic expression" that simply "lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society." *Town of Greece*, 572 U.S. at 575. By contrast to the conduct challenged in *Consumers Union*, then, Conroy's administration of the guest chaplain program is not "an integral part of the

[House's] deliberative and communicative processes." 515 F.2d at 1349 (quoting *Gravel*, 408 U.S. at 625). Judicial review of Conroy's conduct thus poses no threat to "the integrity of the legislative process." *Brewster*, 408 U.S. at 517.

## III.

Barker contends that the Establishment Clause's general requirement that the government be "neutral in its relations with groups of religious believers and non-believers," *Everson v. Board of Education of Ewing Township*, 330 U.S. 1, 18 (1947), and the Supreme Court's decision in *Town of Greece v. Galloway* prohibit Conroy from excluding atheists like him from the guest chaplain program. For his part, Conroy argues that Barker's suit amounts to "an attack on the practice of legislative prayer itself" and that the district court was therefore correct that Barker failed to state a plausible Establishment Clause claim under the Supreme Court's legislative prayer precedents. Appellees' Br. 39.

The starting point for our analysis is *Marsh v. Chambers*, which involved an Establishment Clause challenge to the Nebraska Legislature's practice of opening legislative sessions with a Judeo-Christian prayer given by a taxpayer-funded chaplain. *See* 463 U.S. at 784–85. Eschewing reliance on the three-part *Lemon* test typically used to assess alleged Establishment Clause violations, the Court instead looked to the history of legislative prayer. *See id.* at 786–92. That history, the Court explained, "sheds light not only on what the draftsmen intended the Establishment Clause to mean, but also on how they thought that Clause applied." *Id.* at 790. The Court thought it especially significant that the very same Congress that passed the Bill of Rights also authorized the appointment of paid chaplains, whose duties included delivering an opening prayer. *See id.* at 788. "It can hardly be thought that in the same week Members of the First Congress voted to appoint and to

pay a Chaplain . . . and also voted to approve the draft of the First Amendment . . . , they intended the Establishment Clause . . . to forbid what they had just declared acceptable." *Id.* at 790; *see also id.* at 788 ("Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress."). Given its "unique history," the Court concluded, legislative prayer did not run afoul of the Establishment Clause. *Id.* at 791.

Observing that the Nebraska Legislature's particular prayer practice was "similar" to that of the First Congress, *id.*, the Court went on to consider whether it nonetheless violated the Establishment Clause because (1) the same Presbyterian clergyman had served as the legislature's chaplain and primary prayer-giver for sixteen years, (2) the chaplain was "paid at public expense," and (3) the prayers he gave were "in the Judeo-Christian tradition," *id.* at 793. Weighing these features "against the historical background" of legislative prayer, the Court upheld the constitutionality of Nebraska's practice. *Id.* The Court indicated, however, that it might have reached a different conclusion if there had been "proof that the chaplain's reappointment stemmed from an impermissible motive" rather than from satisfaction with his performance and personal qualities, *id.*, or any "indication that the prayer opportunity ha[d] been exploited to proselytize or advance any one, or to disparage any other, faith or belief," *id.* at 794–95.

The Supreme Court revisited legislative prayer and elaborated on the principles underlying *Marsh* in *Town of Greece v. Galloway*. That case involved an Establishment Clause challenge to a town's practice of inviting volunteers from religious congregations to deliver an opening prayer at the

town's monthly board meetings. *See* 572 U.S. at 569–72. In its recitation of the facts the Court emphasized that "[t]he town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders maintained that a minister or layperson of any persuasion, including an atheist, could give the invocation." *Id.* at 571. The challengers nonetheless contended that the town's prayer program violated the Establishment Clause because the town allowed sectarian prayers that were, in practice, primarily Christian. *See id.* at 572. The Court began with *Marsh*, describing it as "stand[ing] for the proposition that it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted." *Id.* at 577. Using the legislative-prayer tradition described by *Marsh* as its measuring stick, the Court proceeded to evaluate whether any aspect of the town's prayer practice fell outside the bounds of that tradition. Finding that neither the sectarian content of the town's prayers nor their predominantly Christian character was inconsistent with "the tradition long followed in Congress and the state legislatures," *id.*, the Court concluded that the prayer practice was constitutional, "[s]o long as the town maintains a policy of nondiscrimination," *id.* at 585.

Together, *Marsh* and *Town of Greece* establish a two-step process for assessing the constitutionality of a particular legislative-prayer practice: identify the essential characteristics of the practice and then determine whether that practice falls within the tradition the Supreme Court has recognized as consistent with the Establishment Clause.

As to the first inquiry, although at the time Barker filed his complaint it was plausible that the rules allowed for delivery of a secular invocation, *see supra* at 10–12, the House has since definitively ruled out that possibility. Timing matters. When determining whether a complaint states a claim, we are not

confined by the circumstances existing "at the time of filing," as we are when assessing Article III standing. *Wheaton College*, 703 F.3d at 552. To be sure, given that "Rule 12(b)(6) is not a device for testing the truth of what is asserted," *ACLU Foundation of Southern California v. Barr*, 952 F.2d 457, 467 (D.C. Cir. 1991), we would normally be disinclined to accept a defendant's post-complaint representation that contradicts a factual assertion made in the complaint.

But this is no ordinary case. We deal here with Congress's interpretation of its rules—something no court can lightly disregard. *See United States v. Smith*, 286 U.S. 6, 33 (1932) ("[T]he Court must give great weight to [Congress's] . . . construction of its own rules . . . ."). The Rulemaking Clause of Article I, Section 5 of the Constitution "clearly reserves to each House of the Congress the authority to make its own rules," and as we have explained, interpreting a congressional rule "differently than would the Congress itself" is tantamount to "*making* the Rules—a power that the Rulemaking Clause reserves to each House alone." *United States v. Rostenkowski*, 59 F.3d 1291, 1306–07 (D.C. Cir. 1995) (emphasis added). Accordingly, we accept the House's interpretation of its own rules as requiring a religious prayer, thus eliminating any risk of running afoul of either the Rulemaking Clause or separation-of-powers principles. *See Boehner v. McDermott*, 484 F.3d 573, 580 (D.C. Cir. 2007) (en banc) ("We . . . accept the Ethics Committee's interpretation of the rules as applied to this case, and thereby eliminate the concerns mentioned in *Rostenkowski*."). Barker suffers no prejudice as a result of our acceptance of the House's position because, as explained above, rather than disputing that the House interprets its rules as requiring a religious prayer, he simply argues that the rules themselves compel no such interpretation. *See* Appellant's Br. 23–24 ("Dismissal at this stage was . . . improper because the court could conclude that the House Rule do[es] not, in fact,

preclude a nonreligious prayer . . . ."); Reply Br. 7 (acknowledging the existence of "a supposed House requirement that 'prayer' necessarily must implicate a religious deity" but arguing that prayer can and should be defined more broadly).

The question, then, is this: does the House's decision to limit the opening prayer to religious prayer fit "within the tradition long followed in Congress and the state legislatures"? *Town of Greece*, 572 U.S. at 577. The answer is yes.

In *Marsh*, the Supreme Court took as a given the religious nature of legislative prayer. In holding that opening the legislative day with a prayer amounted not to an establishment of religion but rather to "a tolerable acknowledgment of beliefs widely held among the people of this country," the Court explained that "'[w]e are a religious people whose institutions presuppose a Supreme Being.'" 463 U.S. at 792 (alteration in original) (quoting *Zorach v. Clauson,* 343 U.S. 306, 313 (1952)); *see also id.* ("To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an 'establishment' of religion or a step toward establishment . . . ."). Over the dissent's objection that "prayer is fundamentally and necessarily religious," and thus has no place in the halls of Congress, *id.* at 810 (Brennan, J., dissenting), the Court upheld the practice, describing it as having "coexisted with the principles of disestablishment and religious freedom" "[f]rom colonial times through the founding of the Republic and ever since," *id.* at 786.

The prayer practice at issue in *Town of Greece* was, at least in theory, significantly more inclusive than the one in *Marsh*. *See Town of Greece*, 572 U.S. at 571 ("The town at no point excluded or denied an opportunity to a would-be prayer giver. Its leaders maintained that a minister or layperson of any

persuasion, including an atheist, could give the invocation.").
Yet in that case, too, the Supreme Court recognized legislative
prayer's religious roots. The Court described *Marsh* as
"conclud[ing] that legislative prayer, *while religious in nature*,
has long been understood as compatible with the Establishment
Clause." *Id.* at 575 (emphasis added); *see also id.* at 576 ("That
the First Congress provided for the appointment of chaplains
only days after approving language for the First Amendment
demonstrates that the Framers considered legislative prayer a
benign acknowledgment of *religion's* role in society."
(emphasis added)).

*Marsh* and *Town of Greece* leave no doubt that the
Supreme Court understands our nation's longstanding
legislative-prayer tradition as one that, because of its "unique
history," can be both religious and consistent with the
Establishment Clause. *Marsh*, 463 U.S. at 791. And although
the Court has warned against discriminating among religions
or tolerating a pattern of prayers that proselytize or disparage
certain faiths or beliefs, it has never suggested that legislatures
must allow secular as well as religious prayer. In the *sui generis*
context of legislative prayer, then, the House does not violate
the Establishment Clause by limiting its opening prayer to
religious prayer.

If Barker's complaint rested solely on the contention that
a religious prayer requirement is unconstitutional, we could
stop here. But Barker alleges—and we must accept as true at
this stage of the case—that Conroy excluded him not because
he proposed to give a secular prayer but "because [Barker] is
an atheist." Compl. ¶ 110. According to Barker, the other
reasons Conroy cited for his exclusion—that Barker no longer
practices the faith in which he was ordained and, more recently,
Barker's unwillingness to give a *religious* prayer—are merely
"pretextual." *Id.* ¶ 109. Had he not "part[ed] with his religious

beliefs," Barker alleges, "he would have been approved to deliver an invocation, but as a *nonreligious* officiant with a valid ordination, he was denied." *Id.* ¶ 117 (alterations in original) (internal quotation marks omitted); *see also* Oral Arg. Rec. 55:09–19 (Barker's counsel: "We have these other prayers that are nearly identical to the prayer that Mr. Barker wishes to give. It's just a question of who he is, an atheist, and that's why he was denied.").

To resolve this case, however, we need not decide whether there is a constitutional difference between excluding a would-be prayer-giver from the guest chaplain program because *he* is an atheist and excluding him because he has expressed a desire to deliver a nonreligious *prayer*. Even though we accept as true Barker's allegation that Conroy rejected him "because he is an atheist," Compl. ¶ 110, the House's requirement that prayers must be religious nonetheless precludes Barker from doing the very thing he asks us to order Conroy to allow him to do: deliver a secular prayer. In other words, even if, as Barker alleges, he was actually excluded simply for being an atheist, he is entitled to none of the relief he seeks. We could not order Conroy to allow Barker to deliver a secular invocation because the House permissibly limits the opening prayer to religious prayer. Barker has therefore failed to state a claim for which relief can be granted.

## IV.

For the foregoing reasons, we affirm the district court's dismissal of Barker's Establishment Clause claim.

*So ordered.*